**UNITED STATES of America, Appellee,**

**v.**

**Gregory M. THOMAS, Appellant.**

**Nos. 93–3206, 93–3208, 93–3209, 94–3047 and 94–3055.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1997.

Decided June 3, 1997.

James T. Maloney, appointed by the court, Washington, DC, argued the cause for appellant Gregory M. Thomas and was on the joint briefs.

Mary E. Davis, appointed by the court, Washington, DC, argued the cause for appellant Andre Williams and was on the joint briefs.

Paul Kay, appointed by the court, Washington, DC, argued the cause for appellant Donnell O. Williams and was on the joint briefs.

Dennis M. Hart, appointed by the court, Washington, DC, argued the cause for appellant Derrin A. Perkins and was on the joint briefs.

Marian Flynn, appointed by the court, Washington, DC, argued the cause for appellant McKinley L. Board and was on the joint briefs.

Geoffrey Bestor, Assistant U.S. Attorney, Washington, DC, argued the cause for appellee, with whom Eric H. Holder, Jr., U.S. Attorney, John R. Fisher and Thomas J. Tourish, Jr., Assistant U.S. Attorneys, were on the brief. Elizabeth Trosman, Assistant U.S. Attorney, entered an appearance.

Before WALD, SILBERMAN and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD, Circuit Judge SILBERMAN, and Circuit Judge ROGERS.

WALD, SILBERMAN, and ROGERS, Circuit Judges:

According to a 115–count superseding indictment, appellants McKinley Board, Gregory Thomas, Donnell Williams, Andre Williams, and Derrin Perkins, and nineteen others were players in a sizable conspiracy (the "R Street Crew") to distribute marijuana, PCP, and cocaine around the intersection of R Street and Lincoln Road in Northeast Washington, D.C. On December 23, 1991, Judge Revercomb divided the 24 defendants into four groups for separate trials; the convictions of the first group, which included the three principal leaders of the gang still alive (Anthony Nugent, Kevin Williams–Davis, and Darryl Williams), were affirmed on appeal in *United States v. Williams–Davis*, 90 F.3d 490 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997). Appellants, who were tried in the second group of defendants, contest their convictions and life sentences for various drug-related offenses. We affirm.

## I. Background

### A. *The Organization*

Viewed in the light most favorable to the government, the evidence introduced at trial established that by 1983 the R Street Crew had established a single coordinated drug distribution network selling principally PCP and marijuana. Following the familiar pattern, *see Williams–Davis* at 494; *United States v. Childress,* 58 F.3d 693, 711 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996), Nugent, Williams–Davis, and Darryl Williams (and other unindicted leaders) used a number of lieutenants to coordinate the sale of drugs by others (the runners), who were often juveniles. The organization's lieutenants provided the runners with drugs, collected money from them, and paid them; the lieutenants in turn paid the leaders proceeds from the sales. Many of the lieutenants and runners were close friends or relatives of Nugent, Williams–Davis, Darryl Williams, and others in the organization. In 1987, the group began selling cocaine, which it obtained mostly from connections made by Williams–Davis and Nugent in New York (a total of about

500 kilograms) and in California (about 150 kilograms). The organization would shift configuration slightly as various members (including Nugent and Darryl Williams) were arrested and occasionally did time for drug offenses, but the basic structure—a classic chain conspiracy—held.

The organization maintained, and the leaders and lieutenants supervised activities at, a number of locations in the R Street area where drugs were packaged for distribution (one such location was known as "the shop"), as well as several "stash houses" in which packaged drugs were stored to later resupply runners on the street. Search warrants executed from 1983 to 1991 at these locations, many of which were the residences of relatives and friends of members of the R Street Crew, disclosed extensive evidence of drug activity, including large quantities of marijuana, PCP, and cocaine, guns and ammunition, and packaging materials and paraphernalia.

The R Street Crew's activities included bloody and sometimes deadly clashes with rival drug-peddling gangs and others over control of the neighborhood: Alton Clea, a member of a rival gang, was shot and killed, while another member of the Clea group was shot and wounded; Thomas stabbed a rival dealer in the back; a rival drug dealer was shot the day after a dispute with Thomas; members of the organization "shot up" an auto-body repair shop owned by rival gang members, killing one person and wounding others; Board shot a rival gang member from a car in which Donnell Williams was also riding; Board, accompanied by Donnell Williams, attempted to kill another rival gang member; upon discovering cash missing from a room, Board and another member of the organization pointed guns at other members' heads and forced each member to return singly to the room to return the money; and Donnell Williams and others staged an armed robbery of two women prepared to purchase five kilograms of cocaine. Guns were thus a constant in the organization— among other things, in 1987, a senior member of the Crew attempted to buy guns from an undercover agent of the Bureau of Alcohol, Tobacco, and Firearms, and Board was involved in supplying the organization with guns. The R Street Crew was, not surprisingly, also a target of violence.

Each of the appellants was heavily involved in the gang's drug distribution activities. Thomas was originally one of many runners selling for the organization on a daily basis and was arrested in 1988 for attempted distribution of PCP. By 1988 or 1989 Thomas had become involved in managing runners, and, as noted above, was also involved in the R Street Crew's use of violence against rival distributors. Board began his involvement with the organization as a runner, but soon was managing runners, and packaging drugs for sale. Board was arrested for possession with intent to distribute cocaine and PCP in 1985 and 1986, and in 1990 and 1991, a government informant made several tape-recorded drug purchases and one gun purchase from Board. Board was actively involved in the group's use of violence to control the R Street neighborhood.

Donnell Williams was eleven when the organization first began distributing drugs in 1983, and was fifteen when he was first arrested for selling drugs in 1987. He was arrested four times between May 1988 and March 1990 for selling drugs, and participated in a staged armed robbery and several drive-by shootings which targeted rival gang members. Donnell Williams turned eighteen on December 21, 1989. Andre Williams (the younger brother of Darryl Williams and a cousin of Williams–Davis) was fifteen when he was first arrested in 1984 for selling drugs in the Lincoln Road–R Street area. During 1985 and 1986, Andre Williams continued to sell drugs, was involved in bringing drugs to the stash houses, and supplied drugs to runners. In 1988, Andre Williams was involved in mixing marijuana and PCP, and continued to sell and manage runners. Andre Williams turned eighteen on May 15, 1987. Perkins was selling drugs in the Lincoln Road–R Street area by 1984. Perkins continued to sell marijuana and PCP for the organization until 1986; in 1987, he branched out on his own and the organization became a source from which he purchased large quantities of drugs, which he then resold through his own runners.

The demise of the R Street Crew began in 1990 after a member of the gang robbed a New York go-between of his cocaine, prompting the go-between (caught between the R Street Crew and his Colombian suppliers) to turn FBI informant. *See Williams–Davis*, 90 F.3d at 494. The government was thereby able to tape and present to the jury telephone calls between the informant and leaders of the organization.

### B. *Replacement of Trial Judge and Jury Verdict*

Shortly after the close of the government's case, Judge Revercomb became too ill to continue, and Judge Hogan was assigned to continue the case pursuant to FED. R.CRIM. P. 25(a). To familiarize himself with the case, Judge Hogan had a lengthy telephone conversation with Judge Revercomb; was briefed by Judge Revercomb's law clerk; read all 44 volumes of the trial transcript; and reviewed all pre-trial and trial motions and motions rulings, some of the physical evidence, Judge Revercomb's chamber notes, and some transcripts from the trial in *Williams–Davis*. Appellant Board objected, arguing that Judge Hogan should have read all of the transcripts from the first trial as background material and, even if he were to do so, Judge Hogan still would not have been in a position to judge the demeanor of the witnesses. Taking the objection on behalf of all defendants, Judge Hogan denied it, stating that his review of the materials satisfied Rule 25(a).

On February 11, 1993, the jury returned its verdicts. The jury convicted each appellant of conspiracy to distribute and possess with intent to distribute various drugs (the drug conspiracy), 21 U.S.C. §§ 841, 846, and of conspiracy to participate in a racketeer influenced corrupt organization (the RICO conspiracy), 18 U.S.C. § 1962(d). The jury found Board guilty of a substantive RICO violation, 18 U.S.C. § 1962(c), but acquitted the other appellants on this charge.

The jury also found Board guilty of six counts of distribution or possession with intent to distribute drugs, 21 U.S.C. §§ 841(a)(1), (b)(1); four counts of use of a

communication facility in connection with the drug offenses, 21 U.S.C. § 843(b); one count of employing juveniles to distribute drugs, 21 U.S.C. § 845b (now § 861); assault with intent to kill while armed, D.C.CODE §§ 22–501, 22–3202; possession of a firearm during that offense, D.C.CODE § 22–3204(b); and unlawful shipment, transportation or receipt of a firearm, 18 U.S.C. § 924(b). Donnell Williams was convicted of one count of distribution of drugs and one count of use of a communication facility in connection with that offense, and Thomas and Perkins were convicted of one count each of employment of juveniles to distribute drugs. The jury acquitted Andre Williams of the four non-conspiracy counts with which he was charged.[1]

### C. *Sentencing*

In separate hearings held from November 1, 1993, to April 21, 1994, Judge Hogan sentenced each of the appellants to concurrent terms of life in prison without parole and sentenced Board to additional terms in prison for other offenses. Judge Hogan relied on the presentence reports to calculate the total amount of drugs involved in the conspiracy. Specifically, each report calculated the total amount involved—the equivalent of over 1,000,000 kilograms of marijuana—in the same way:

- 150 kilograms of crack cocaine supplied by Alvin Buckhalter [the gang's Los Angeles supplier] to the conspiracy, converted to 30,000 kilograms of marijuana;

- 500 kilograms of cocaine supplied by Claude Jiggins [the gang's New York supplier] to the conspiracy, converted to 100,000 kilograms of marijuana; and

- 1,000 kilograms of PCP/marijuana distributed by the conspiracy, converted to 1,000,000 kilograms of marijuana per the Sentencing Guidelines tables.

The presentence reports arrived at this last figure as follows:

Testimony reflects that the organization sold quantities of liquid PCP, marijuana laced with PCP, cocaine, and on occasion, cocaine base, approximately 12 hours per

---

1. The jury also acquitted a sixth defendant, Steve Williams, of all charges.

day, seven days per week, and practically every day of the year. Participants testified that between 1984 and 1990, the organization sold on an average of $9,000 to $30,000 worth of PCP lids (lids = 1 to 1½ ounces of PCP) per night. A lid sold for approximately $150, and a one ounce bottle of liquid PCP sold for approximately $300. On the basis of the aforementioned, it is therefore estimated that the organization distributed over 1,000 kilograms of PCP and marijuana.

Although the presentence report does not specify how the figure of 1,000 kilograms was calculated, the government offers an explanation in its brief: $9,000 per day (the lowest dollar amount for a single day), divided by $150 per one ounce lid, equals 60 ounces per day; 60 ounces distributed 200 days per year is approximately 340 kilograms per year (one ounce = 28.35 grams); 340 kilograms per year for seven years is 2,380 kilograms—more than twice the amount arrived at in the presentence reports. None of the appellants directly challenge the calculation of the total amount of drugs involved in the conspiracy.

We consider first appellants' challenges to their convictions and then address their sentencing claims.

## II.

### A. *Donnell Williams' Jurisdictional Challenge*

Appellant Donnell Williams argues that because he was a juvenile when he became embroiled in the R Street Crew conspiracy and remained a juvenile for most of the time that he was engaged in illegal activity, the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. § 5031 *et seq.*, forbade his prosecution as an adult absent compliance with its procedural requirements for transfer to the adult criminal system. The FJDA provides that

[a] juvenile alleged to have committed an act of juvenile delinquency, . . . shall not be proceeded against in any court of the United States unless the Attorney General . . . certifies to the appropriate district court of the United States that . . . (3) the offense charged is a crime of violence that

is a felony or an offense described in [21 U.S.C. § 841] . . . and that there is a substantial Federal interest in the case or offense to warrant the exercise of Federal jurisdiction.

18 U.S.C. § 5032. A "juvenile" under the FJDA is a "person who has not [yet] attained his eighteenth birthday, or for the purpose of proceedings and disposition under [the FJDA] for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday. . . ." 18 U.S.C. § 5031. "[J]uvenile delinquency" is "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." *Id.*

Viewing the evidence in the light most favorable to the government, Donnell Williams was eleven years old when he began participating in the illegal activities of the R Street Crew. He turned eighteen on December 18, 1989, and was nineteen when he was indicted for his involvement in the conspiracy and for various related substantive offenses. He was convicted of RICO conspiracy (Count 2), narcotics conspiracy (Count 3), unlawful distribution of narcotics on October 22, 1990 (Count 93) and unlawful use of a communications facility on October 22, 1990 (Count 94). The two substantive offenses were acts in furtherance of the narcotics and RICO conspiracies, but they constitute separate crimes from the conspiracy offenses. *See United States v. Felix,* 503 U.S. 378, 390–91, 112 S.Ct. 1377, 1384–85, 118 L.Ed.2d 25 (1992). The FJDA's definition of juvenile delinquency clearly does not apply to the two substantive offenses because they were committed after Donnell Williams was eighteen years old; there is no question that it was permissible to prosecute Donnell Williams as an adult for those crimes. On the other hand, both conspiracy offenses began before Williams turned eighteen and ended afterward.

 Under established circuit precedent, a defendant charged with conspiracy may be tried as an adult even if he first became involved in the conspiracy while still a minor, so long as he continues to participate in the conspiracy after reaching the age

of eighteen. *See United States v. Strothers*, 77 F.3d 1389, 1392 (D.C.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 374, 136 L.Ed.2d 263 (1996); *see also United States v. Spoone*, 741 F.2d 680, 687 (4th Cir.1984), *cert. denied*, 469 U.S. 1162, 105 S.Ct. 917, 83 L.Ed.2d 929 (1985). Relying on *United States v. Chambers*, 944 F.2d 1253, 1257 (6th Cir.1991), *cert. denied*, 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992), Donnell Williams argues nonetheless that since "most" of his involvement in the R Street Crew conspiracy took place prior to his reaching age eighteen, he should still benefit from the FJDA. In *Chambers*, 944 F.2d at 1257, the Sixth Circuit applied the special procedural protections of the FJDA to defendants who "were under eighteen years of age during the greater part of the conspiracy and performed their overt acts in furtherance of the conspiracy while they were between fifteen and eighteen years of age." Though its literal language is ambiguous and could be construed to lend some support to Williams' claim, we note that other and later Sixth Circuit decisions involving the identical issue, *see United States v. Gjonaj*, 861 F.2d 143, 144 (6th Cir.1988); *United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir.), *cert. denied*, 510 U.S. 1206, 114 S.Ct. 1328, 127 L.Ed.2d 675 (1994); *United States v. Odom*, 13 F.3d 949, 957 (6th Cir.), *cert. denied*, 511 U.S. 1094, 114 S.Ct. 1859, 128 L.Ed.2d 481 (1994), discount any suggestion that the quantum of a defendant's pre- and post-majority involvement in a conspiracy is relevant for the purpose of determining subject matter jurisdiction so long as the defendant signaled his desire to continue as an active participant after the age of eighteen, and we see no persuasive rationale for any other rule. Additionally, in contrast to the *Chambers* defendants, Donnell Williams was convicted of two substantive offenses committed in furtherance of the conspiracy after he turned eighteen, surely sufficient indicia of his intent to continue with the R Street Crew. In such circumstances, the FJDA does not bar his prosecution for the conspiracies charged. *See Strothers*, 77 F.3d at 1392. As we discuss in Section III.D.3 of this opinion, *see infra* pp. 263–266, an adult conviction for such age-of-majority spanning conspiracies must be based solely on the adult participation in the conspiracy.

**B. *Derrin Perkins' Challenges to Convictions***

Appellant Derrin Perkins was convicted of RICO conspiracy, pursuant to 18 U.S.C. § 1962(d) (1984) (Count 2); narcotics conspiracy, pursuant to 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii)(II), (b)(1)(A)(iv), (b)(1)(A)(iii), (b)(1)(B)(i) & (b)(1)(D) (1984) (Count 3); and employment of juveniles to distribute drugs, pursuant to 21 U.S.C. §§ 845(b), (a)(1) (1984) (now 21 U.S.C. § 861 (1996)), 841(a)(1) & 841(b)(1)(A)(iv) & (b)(1)(D) (Count 11). On appeal he contends that his convictions must be reversed because the government failed to introduce sufficient evidence to support his conspiracy convictions, there was a material variance between the charged conspiracy and the evidence presented at trial, he was substantially prejudiced by prosecutorial misconduct during opening argument to the jury, and the district court refused to instruct the jury on his theory of defense. We find no basis for reversal of his convictions.

**1. *Sufficiency of the Evidence for Narcotics Conspiracy Conviction***

Perkins contends that the government's evidence of drug activity established only that he participated in illegal drug activity independent of the R Street Crew, and that there was no evidence that he served as a manager, director, or member of the conspiracy for which he was convicted. Viewing the evidence in the light most favorable to the government, as we must,[2] Perkins had long and intricate ties to the R Street Crew. Numerous witnesses testified that Perkins purchased drugs from several of the R Street operators and also sold drugs for them.

---

**2.** *See United States v. Wynn*, 61 F.3d 921, 923 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995); *United States v. Mitchell*, 49 F.3d 769, 772 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 327, 133 L.Ed.2d 228 (1995) (quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *United States v. Lewis*, 626 F.2d 940, 951 (D.C.Cir.1980).

The government's evidence included, for example, testimony from Dale Webster who stated that she saw "drug activity" in late 1984 on the corner of Lincoln and R Streets by "a lot of the guys that grew up in the neighborhood," including Kevin Williams, Anthony Nugent, Darryl Williams, Andre Williams, and Perkins. Kenneth Sparrow testified that in 1985, runners wanting coke would say, "go find Derrin, or something like that." While Perkins also worked alone in 1986 on Lincoln Road between Quincy and R Streets, and "was a boss of his own," Sparrow testified that Perkins also sold drugs in 1985 for Andre Jackson, who worked for Williams–Davis and Nugent. Dax Nelson, a long-time drug dealer in the R Street area, confirmed that Andre Jackson and Perkins sold cocaine at Lincoln and R Streets, that he and Perkins sold drugs at First and Quincy Streets every day in 1988 and 1989, and that together they made a lot of money. Nelson further testified that when he began selling PCP in 1988 or 1989, while he normally obtained drugs from Kevin Williams–Davis and others, on one occasion Williams–Davis had run out of PCP and Nelson bought a 16–ounce bottle from Perkins for $2,500. Although Nelson did not always know who sold Perkins his drugs, on one occasion it was Odenga Dyson, who worked for Williams–Davis.

The government's evidence also revealed that Perkins had obtained drugs from the R Street Crew that he sold on his own. Witherspoon testified that after selling drugs for the R Street Crew in 1987, he moved to a different location and was introduced to Perkins and began to sell drugs for him. In the summer of 1988, and for six months thereafter, Witherspoon acted as Perkins' lookout. Witherspoon recounted Perkins' various drug-related activities, including an occasion when he saw Perkins give Darrell Williams a large wad of money and was told that Perkins and Darrell Williams were going to the "warehouse," and an occasion when Perkins told Witherspoon that Anthony Nugent wanted Witherspoon to "do something," and thereafter Witherspoon made a $5,000 delivery of cocaine to a customer, for which Nugent paid him.

Other witnesses confirmed Perkins' relationship with the R Street Crew. Frankie Pelham testified that in 1988, when he decided to branch out on his own, he bought sixteen ounces of PCP and half an ounce of cocaine from Perkins. Stephoun Hartwell testified that he accompanied Pelham to Perkins' house to buy cocaine twice; the second time, Pelham went into Perkins' house and reported that Perkins was "cooking it up." Rosalind Cherry testified that on about ten occasions she accompanied Odenga Dyson, her boyfriend, to deliver bottles of PCP to Perkins. Cherry also saw Dyson receive a bag of money from Perkins. Maurice Brooks claimed that Perkins told him that he had taken a bullet out of Williams–Davis' leg after a shootout that occurred as part of the R Street Crew's attempt to put a competitor out of business. Charles Smith testified that he saw Perkins at 319 Rock Creek Church Road, the home of Andre Williams and a central location where the R Street Crew stored and packaged drugs,[3] and that he once saw Perkins speaking with Darryl Williams.

There was also testimony that Perkins owned several expensive cars and hid his ownership. Sparrow testified that Perkins drove a Volkswagen Cabriolet and a green Mercedes Benz. Nelson claimed that Perkins' "Benz" was a 300–E and that Perkins also owned a white Nissan 300Zx. At least three other witnesses confirmed Perkins' ownership of these cars. Nelson also testified that Perkins had registered the Mercedes Benz in someone else's name. In addition, a salesman at a local Mercedes Benz dealer testified that Perkins had paid in cash for an expensive auto repair.

Finally, there was evidence that Perkins sponsored health club memberships for Nugent, Williams–Davis, and Jeffrey Williams,

---

**3.** Sparrow, who lived at 319 Rock Creek Church Road during a period of time in 1987, testified that he and Andre Williams packaged drugs in the basement and delivered drugs to R Street. The police executed search warrants at 319 Rock Creek Church Road on March 24, 1988, recovering liquid PCP and a heat-sealer, and on June 15, 1990, recovering over $11,400 in cash, cocaine, heroin, a money counter, electric scales, two handguns, and other drug packaging paraphernalia.

and there were photographs showing Perkins with the leaders of the R Street Crew.

Based on this evidence, the government maintains that a reasonable jury could find that Perkins was selling drugs for his own account as well as being part of the hierarchy of the R Street Crew in 1984–85, and further, that his association with the Crew in later years showed that he was part of the drug and RICO conspiracies. Perkins maintains that the evidence showed only that he was an independent dealer, who was "universally described" as not being a member of the R Street Crew. He contends that no inference can be drawn from Dale Webster's testimony that Perkins sold with the R Street Crew during the early stages of the conspiracy in 1983 and 1984, and that Webster's testimony on cross-examination demonstrated that he had merely seen Perkins talking with others on a street corner where drugs were sold in a neighborhood in which Perkins had lived most of his life. He also contends that although the R Street Crew targeted rival drug sellers with violence, certain members, including Perkins, were not involved in such attacks. Perkins emphasizes that only Rosalind Cherry testified about his link to R Street Crew drug deliveries and that this activity occurred only during the summer of 1989. He further maintains that Witherspoon's testimony confirmed that Perkins and the R Street Crew operated in "competiti[on]" with one another. To support his contention that he operated independently, Perkins relies in part on Frankie Pelham's testimony that when he bought drugs from Perkins in 1988, rather than from Nugent or Williams–Davis, he was confident that the R Street Crew would not become aware of his purchases. Finally, Perkins maintains that Witherspoon's testimony "contradicts the government's theory of hierarchical control over a monolithic drug organization," because, according to Witherspoon, directions and payment for a delivery he made for Nugent and Williams–Davis while "on loan" from Perkins came directly from Nugent, rather than through Perkins.

■ Although a jury could view the evidence as Perkins suggests, it was not required to do so and the evidence, as the government contends, was sufficient for a reasonable jury to find that Perkins repeatedly bought drugs from R Street Crew members, sold in the R Street Crew's turf without being targeted for retaliation as were the Crew's rivals, and shared at least one runner with the R Street Crew. Further, contrary to Perkins' contention that the evidence showed only that he maintained a buyer-seller relationship with the R Street Crew, a reasonable jury could find that his relationship was more extensive and involved the R Street Crew's overall drug operations. While a mere buyer-seller relationship is insufficient to show conspiratorial activity, where the evidence shows that a buyer procured drugs with knowledge of the overall existence of the conspiracy, he may be found to have entered into the conspiratorial agreement. *See United States v. Theodoropoulos,* 866 F.2d 587, 594 (3d Cir.1989); *United States v. Douglas,* 874 F.2d 1145, 1151–55 (7th Cir.), *cert. denied,* 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989); *see also United States v. Sobamowo,* 892 F.2d 90, 94–95 (D.C.Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990); *United States v. Morris,* 836 F.2d 1371, 1373–74 (D.C.Cir.1988); *United States v. Bascaro,* 742 F.2d 1335, 1359–60 (11th Cir.1984), *cert. denied sub nom. Hobson v. United States,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985). The jury could reasonably conclude, based on Perkins' long-term, drugrelated contacts with the R Street Crew and his ongoing drug activities in the area under their control, that Perkins was aware of the existence of the R Street Crew and that he directly profited from the existence of the conspiracy by procuring drugs and receiving, at a minimum, cooperation from the organization. *See United States v. Dickey,* 736 F.2d 571, 582–83 (10th Cir.1984), *cert. denied sub nom. Beasley v. United States,* 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *see also United. States v. Bynum,* 485 F.2d 490, 496 (2d Cir.1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). Accordingly, Perkins' sufficiency challenge to his drug conspiracy conviction fails.

2. *Sufficiency of the Evidence for RICO Conspiracy Conviction*

■ Perkins' challenge to his RICO drug conspiracy conviction is no more persuasive. Under 18 U.S.C. § 1962(c), it is unlawful for an individual "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity...." An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(d). *See also United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Section 1962(d) makes it "unlawful for any person to conspire to violate" subsection (c). The government meets its burden of proof to show the existence of an agreement to participate in an unlawful enterprise by showing that the defendant agreed personally to the commission of two or more predicate acts defined by the RICO statute. *See United States v. Crosby,* 20 F.3d 480, 481 (D.C.Cir.), *cert. denied,* 513 U.S. 883, 115 S.Ct. 221, 130 L.Ed.2d 148 (1994); *United States v. Church,* 955 F.2d 688, 694 (11th Cir.), *cert. denied sub nom. Coppola v. United States,* 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992).

Perkins does not dispute that the government presented sufficient evidence to show the existence of the RICO enterprise, namely the R Street Crew, but rather contends that the evidence was insufficient to convict him of RICO conspiracy because the government failed to prove the two predicate offenses and that he participated in the direction and control of the enterprise. Perkins' first contention is meritless because the government presented sufficient evidence to prove his involvement in the drug conspiracy. His second contention rests on the proposition that the direction and control requirements set forth in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), apply to a RICO conspiracy. This is a question of first impression in this circuit.

In *Reves,* the Supreme Court held that to be convicted of a substantive RICO offense under § 1962(c), "one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. at 1173. This interpretation, the Court concluded, was supported by the plain meaning of the terms and the context of § 1962(c), as well as the legislative history of the RICO statute. *Id.* at 177–84, 113 S.Ct. at 1169–73. Specifically, the Court concluded that the term "conduct" as used in § 1962(c) required that defendants be found to exercise "some degree of direction" over the enterprise, *id.* at 178, 113 S.Ct. at 1169, and that the word "participate" required "some part in that direction." *Id.* at 179, 113 S.Ct. at 1170. The Court affirmed the lower court's view that an accounting firm, engaged in the valuation of a farming cooperative based on yearly audits and financial statements, could not be held civilly liable to the cooperative's noteholders under § 1962(c) after the cooperative filed for bankruptcy. *Id.* at 186, 113 S.Ct. at 1172–73. Although the Court indicated that "liability under § 1962(c) is not limited to upper management," *id.* at 184, 113 S.Ct. at 1172–73, the Court declined to decide "how far § 1962(c) extends down the ladder of operation...." *Id.* at 184 n. 9, 113 S.Ct. at 1173 n. 9.

The four circuits that have confronted the contention that the management and control test set forth in *Reves* should apply to RICO conspiracy charges brought under § 1962(d) have split. Prior to *Reves,* a majority of the circuits had held that § 1962(d) is violated when a defendant agrees to join in the commission of a substantive RICO offense, regardless of whether he agrees to commit personally two predicate acts. *See, e.g., United States v. Pryba,* 900 F.2d 748, 760 (4th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990); *United States v. Rosenthal,* 793 F.2d 1214, 1228 (11th Cir.1986), *cert. denied sub nom. Stewart v. United States,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Neapolitan,* 791 F.2d 489, 498 (7th Cir.), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986); *United States v. Adams,* 759 F.2d 1099, 1116 (3d

Cir.), *cert. denied sub nom. Mustacchio v. United States,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985); *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.), *cert. denied sub nom. Tillie v. United States,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984).[4] The rationale underlying these decisions is that conspiracy to commit a RICO violation should be treated no differently than is conspiracy generally. As the Seventh Circuit points out, requiring in the RICO context that a conspirator agree to participate personally in carrying out the racketeering activities in § 1962(c) would require a "degree of involvement in the affairs of the conspiracy that is not required in any other type of conspiracy, where agreeing to a prescribed objective is sufficient." *Neapolitan,* 791 F.2d at 498. Consequently, the Seventh and Eleventh Circuits have held that, notwithstanding *Reves,* evidence that a defendant has conspired to participate in the operation or management of the enterprise is unnecessary to support a RICO conspiracy conviction under § 1962(d). *See United States v. Starrett,* 55 F.3d 1525, 1547 (11th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996); *United States v. Quintanilla,* 2 F.3d 1469, 1484–85 (7th Cir.1993); *see also Jones v. Meridian Towers Apartments, Inc.,* 816 F.Supp. 762, 773 (D.D.C. 1993). The Third and the Ninth Circuits have taken the opposite position, viewing *Reves'* interpretation of § 1962(c) necessarily to apply as well to conspiracy charges under § 1962(d) to violate § 1962(c). *Neibel v. Trans World Assurance Co.,* 108 F.3d 1123, 1128 (9th Cir.1997); *United States v. Antar,* 53 F.3d 568, 581 (3d Cir.1995).

The view that the usual legal standards applicable to criminal conspiracy should apply to § 1962(d) is in accord with this court's pre-*Reves* statement in *Danielsen v.Burnside–Ott Aviation Training Center, Inc.,* 941 F.2d 1220, 1224 (D.C.Cir.1991) (dictum), that Congress did not intend in § 1962(d) to create a new substantive offense: "[§ 1962(d)] adds nothing substantive to the law. Rather,

it makes it unlawful to conspire to violate any of the preceding three sections." Yet this statement provides little guidance on whether the distinction drawn by the Supreme Court in *Reves* applies to a conspiracy charge under § 1962(d). Further, nothing in *Danielsen* is inconsistent with the interpretation of the Third Circuit in *Antar,* 53 F.3d at 581, that to avoid eviscerating *Reves,* the RICO conspiracy provision must be read to provide for conviction only where the defendant conspires to operate or manage the enterprise, and not where the defendant simply conspires with someone who is operating or managing the enterprise.

■ Regardless of which approach this circuit adopts, Perkins' challenge to his RICO conviction fails. Under the pre-*Reves* approach noted in *Danielsen,* 941 F.2d at 1224, Perkins could not seriously contend that there was insufficient evidence to convict him of RICO conspiracy. Yet even if the court were to apply *Reves'* management and control test, Perkins also could not prevail because the evidence showed that he eventually became an essential part of ensuring the continuation of the conspiracy when other leaders were in jail. Therefore, whether the court construes *Reves* to have left undisturbed longstanding principles of conspiracy law, or alternatively views the Supreme Court's interpretation of § 1962(c) to require direct involvement in management and operation for conviction of a conspiracy to violate that section under § 1962(d), Perkins has no basis on which to complain that his conviction rests on nothing more than his mere association with the Crew, *cf. Ruggiero,* 726 F.2d at 921; *Winter,* 663 F.2d at 1136, given the evidence that Perkins played a key role in the R Street Crew at a level high enough to come within the *Reves* management and control test.

3. *Material Variance Between Indictment and Evidence at Trial*

Perkins also contends that he was prejudiced by a material variance between the

---

4. By contrast, the First and Second Circuits require the government to prove that a defendant agreed to commit personally two or more predicate crimes to be convicted of RICO conspiracy. *See United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.), *cert. denied sub nom. Rabito v. United*

*States,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Winter,* 663 F.2d 1120, 1135–37 (1st Cir.1981), *cert. denied sub nom. Goldenberg v. United States,* 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983).

indictment and the evidence at trial, maintaining that the evidence demonstrated the existence of multiple conspiracies and not simply the one drug conspiracy charged in the indictment. *See, e.g., Kotteakos v. United States,* 328 U.S. 750, 765–66, 66 S.Ct. 1239, 1248–49, 90 L.Ed. 1557 (1946); *United States v. Tarantino,* 846 F.2d 1384, 1391–92 (D.C.Cir.), *cert. denied sub nom. Burns v. United States,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988). Again, we view the evidence in the light most favorable to the government because this contention presents the question whether a reasonable jury could have found Perkins guilty of each element of the single conspiracy with which he was charged. *See Childress,* 58 F.3d at 709; *United States v. Pou,* 953 F.2d 363, 369 (8th Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992); *Tarantino,* 846 F.2d at 1391–92; *United States v. Universal Trade & Indus., Inc.,* 695 F.2d 1151, 1153 (9th Cir.1983).

■ Perkins confuses two independent claims, neither of which has merit. His contention that witnesses failed to establish that he was aware of the R Street Crew or that his own narcotics dealings were dependent upon that network simply rephrases his sufficiency challenge to his drug conspiracy conviction, which we have concluded is meritless. His second contention, that the government's failure to prove the existence of an overarching conspiracy resulted in a material and prejudicial variance between the indictment and the proof presented at trial, is unpersuasive because Perkins has neither defined nor identified the several conspiracies that he claims the evidence showed. Even if, as Perkins maintains, Sparrow's testimony "illuminated the ups and downs of the 'R' Street [Crew]," that the organization's strength and activities may have varied over time does not negate evidence of the existence of an overarching conspiracy. The cases on which Perkins relies are distinguishable because each involved evidence showing the existence of identifiable multiple conspiracies. *See, e.g., United States v. Durades,* 607 F.2d 818, 819 (9th Cir.1979); *United States v. Bertolotti,* 529 F.2d 149, 154–59 (2d Cir.1975). Indeed, by acknowledging that the government "presented a number of witnesses who linked

Anthony Nugent and Kevin Williams–Davis with West Coast and New York narcotics distribution rings, and from there to the District of Columbia and then on to the 'R' Street and Lincoln Road N.E. area," Perkins comes close to acknowledging the existence of a single overarching conspiracy. In any event, because Perkins fails to explain in what way the government's evidence fell short of establishing the existence of a single conspiracy, to identify evidence supporting his contention that multiple conspiracies existed, and even to advance his conception of the dates and members of the several conspiracies that he claims operated, his variance challenge fails.

### 4. *Jury Instruction*

■ Perkins further contends that the district court erred in refusing to instruct the jury on his theory of defense that the government's evidence showed multiple conspiracies and possible drug activity by him that was unconnected to the R Street Crew. In his view, the jury instructions failed to address two points essential to his defense: first, that proof of a buyer-seller relationship is insufficient evidence of a conspiratorial agreement, and second, that to convict of conspiracy, the jury had to find, in addition to evidence of the existence of a conspiracy, that he was a member of the same conspiracy charged in the indictment. As a general rule, the refusal to give an instruction requested by the defendant is reversible error only if the instruction is substantively correct, not already substantially covered in other instructions given to the jury, and concerns an important point in the trial such that the failure to give it seriously impairs the defendant's ability to present effectively his defense. *See United States v. Taylor,* 997 F.2d 1551, 1558 (D.C.Cir.1993). We find no such error here.

Perkins requested the district court to instruct the jury that:

It is the position of the defendant Derrin Perkins that he is not a member of the drug or RICO conspiracy that is alleged by the government in this indictment. He has denied any illegal association or agree-

ment with any of the persons the government claims are co-conspirators. He has denied the commission of all of the predicate acts upon which the RICO charge is based.

The government has presented several witnesses who claimed to have knowledge of Mr. Perkins' drug activities. You are instructed that a single sale, distribution or transaction does not constitute the crime of conspiracy to distribute drugs. You are also instructed that a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement. Thus, you are instructed that if you find that Mr. Perkins committed a single act and nothing more, you must acquit him of the charge of drug conspiracy.

If, on the other hand, you find that the defendant Perkins did engage in actions consistent with his membership in a criminal conspiracy, you must find that he was a member of the same conspiracy alleged in this indictment in order to convict him in this case. However, if you find that he was a member of another conspiracy, albeit a conspiracy with the same methods and goals, you must acquit Mr. Perkins of that charge.

The district court agreed to give the first paragraph of Perkins' proposed instruction, but ruled that the second and third paragraphs were covered by other instructions. Perkins responded that he did not want the court to give only the first paragraph of the instruction; if the court was unwilling to give the remaining paragraphs, Perkins stated that he did not want the first paragraph to be included in the jury instructions.

■ Perkins' requested instruction misstated the law on buyerseller relationships in narcotics conspiracies, and hence the district court properly refused to include it in the instructions to the jury. Instead, the district court properly instructed the jury on the role of buyer-seller relationships in narcotics conspiracies.[5] Perkins proposed that the jury be told that "a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement," without also being advised that a buyer may be found to be a member of a conspiracy if he is aware of the structure of the conspiracy and the participation of third parties, and if he profits from and intends to further the conspiracy. *See, e.g., Sobamowo,* 892 F.2d at 94; *Bascaro,* 742 F.2d at 1359. In addition, the third paragraph of Perkins' requested instruction was addressed fully in other instructions given to the jury.[6] Accordingly, because Per-

5. The district court instructed the jury, in pertinent part:

You should not base your determination of the guilt or innocence on the extent of a defendant's participation in the alleged conspiracy. A defendant may be convicted as a conspirator even though he or she plays a minor role in the conspiracy, provided that you find beyond a reasonable doubt that the conspiracy existed, and that the defendant knowingly participated in the conspiracy with the intent to encourage, advise, or assist other conspirators. Similarly, a buyer or customer of a conspiracy's product who knowingly assumes a role instrumental to the success of the conspiracy, including evidence that the buyer was among the selling group's best customers, maintained a close relationship with the selling group and upon whose participation and cooperation the selling group's endeavors in some part depended, may also be deemed a member of the conspiracy.

6. The district court instructed the jury that:

In this case, some of the defendants contend that the government's proof fails to show the existence of only one overall conspiracy. Instead, there may be evidence that there were

actually several separate and independent conspiracies with various groups of members.

Whether there existed a single unlawful agreement, or many such agreements, or indeed, no agreement at all is a question of fact for you, the jury, to determine in accordance with the instructions I am about to give you.

When two or more people join together to form one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.

Proof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in the indictment, unless one of the conspiracies proved happens to be the single conspiracy described in the indictment.

. . .

[I]f you find that the conspiracy charged in the indictment did not exist, you cannot find any defendant guilty of the single conspiracy charged in the indictment . . .

[I]f you find that a particular defendant was a member of another conspiracy, and not the one charged in the indictment, then you must

kins' theory of defense was properly presented in the jury instructions, he fails to show reversible error.

## C. *Andre Williams' and Derrin Perkins' Prosecutorial Misconduct Claims*

■■■■ Appellants Derrin Perkins and Andre Williams contend that their convictions must be reversed because of prosecutorial misconduct during opening argument to the jury. The touchstone of a prosecutorial misconduct claim is prejudice: the court must consider "the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). To determine whether improper remarks by the prosecutor have substantially prejudiced a defendant's trial, the court looks to "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks." *Williams–Davis,* 90 F.3d at 507 (quoting *United States v. Monaghan,* 741 F.2d 1434, 1443 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985)).

As to both appellants, the prosecutor's opening statement to the jury stated that the government would present evidence that would implicate the defendant in certain criminal activities, no evidence of which was ultimately produced at trial. Regarding Williams, the prosecutor told the jury that the government would show that he was involved in the murder of Joel Mays, a drug operator who was a rival of the R Street Crew.[7] The murder of Joel Mays was charged solely as a racketeering act in the RICO counts in the indictment. When the government failed to present any evidence relating to this murder, the district court dismissed the racketeering act at the close of the government's case. Williams contends on appeal that he was prejudiced by the government's statement that it would present evidence to show his role in the Joel Mays murder when no such evidence was introduced at trial. In denying Williams' motions for a mistrial, the district court found that there was no evidence of bad faith by the prosecutor, who explained that he was unable to present the evidence because the witness upon whom he was relying was uncertain whether Andre Williams or Darryl Williams was present at the murder. The district court also noted that a substantial period of time had lapsed between the time of the opening statement and the time that the jury commenced its deliberations. Finally, the court offered to instruct the jury, if Williams so desired, to disregard the prosecutor's references to the Joel Mays murder during the opening argument because no evidence on the matter was introduced at trial. During closing argument, Williams' counsel argued to the jury that the government's case lacked credibility in light of the government's failure to produce evidence of Williams' alleged role in the Mays murder. The district court, in turn, instructed the jury that opening state-

---

thus acquit the defendant of the conspiracy charge.

7. In his opening statement to the jury, the prosecutor said:

You will hear that on March 26, 1988, the same day Frankie Pelham will tell you that he was down there selling drugs and was arrested, that another individual by the name of Joel Mays was in the area of Lincoln Road and R Street and he was selling drugs. It is uncertain. The evidence is not clear where he got his drugs.

The evidence will show, ladies and gentlemen, that during the course of that evening, he was confronted by, among other people, Andre Williams, Neal Hilliard, also known as Neal, an indicted member of this conspiracy who is half way down the list here, one of the lieutenants for the R Street conspiracy, and another person by the name of Ronnie Isler, Goobley, also known as Goobley.

You will hear that Mr. Hilliard, Mr. Isler and Mr. Williams told him, you shouldn't be selling down on R Street. This is our turf. You go down the street. And you will hear that Joel Mays made the same mistake that Alton Clea made. He disrespected the people. He refused to go.

And you will hear testimony and when he did that, Ronnie Isler went to a grey Pathfinder, which you'll hear a lot of testimony about, the Pathfinder nominally owned by a woman named Valerie Williams, but in fact owned by Darryl Williams, went there and got a .38 caliber gun, came back and shot Mr. Mays to death, shooting him six times.

This is the way the evidence will show the R Street organization dealt with any breaches of their organization.

ments were not evidence, and that the jury was not to consider "in any way that allegation [relating to the Joel Mays murder] against Andre Williams. You should not even discuss that allegation during your deliberations."

Regarding Derrin Perkins, the prosecutor stated in his opening argument to the jury that the government would prove sixteen facts at trial to show that Perkins began selling drugs on the street like the other members of the Crew, and rose in the ranks to work at the drug stash house, eventually playing a key role in enabling the conspiracy to continue after other leaders were jailed and enhancing its financial success through a money laundering scheme involving the leasing of expensive automobiles under the names of nominees.[8] Perkins contends that the government provided no evidence regarding some of these facts at trial; as to others, Perkins contends that any evidence of illicit activity was unconnected to him. Most prejudicial, Perkins contends, was the prosecutor's statement to the jury that after Perkins' arrest he confessed to an FBI agent that he was guilty of most of the conduct that was later charged in the indictment. In denying Perkins' motions for judgments of acquittal at the close of the government's case-in-chief and at the close of all the evidence, the district court ruled that the prosecutor had represented in opening argument what he in good faith had thought he could prove, that some of the facts could reasonably be inferred from evidence at trial, that in closing argument defense counsel had seized upon the government's failure to prove the facts promised in the prosecutor's opening statement, and that, as a result, Perkins suffered no prejudice in light of the evidence introduced by the government at trial.

On appeal, the government concedes, as it must, that it failed to produce evidence supporting its opening statement. In *Williams–Davis*, which involved the trial of high-level members of the R Street Crew, the court characterized similar errors as "severe misconduct." 90 F.3d at 507. In that case the court also had occasion to observe that "[t]his court has long recognized that a prosecutor is obliged 'to avoid making statements of fact to the jury not supported by proper evidence introduced during trial.'" *Id.* (quoting *Gaither v. United States,* 413 F.2d 1061, 1079 (D.C.Cir.1969)). The purpose of an opening statement is to "provid[e] background on objective facts while avoiding prejudicial references. . . ." *United States v. Small,* 74 F.3d 1276, 1283 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1867, 134 L.Ed.2d 965 (1996). In *Small,* the court quoted with approval the Fourth Circuit's statement in *United States v. Brockington,*

---

8. In his brief, Perkins sets forth the sixteen facts that the government promised but failed to prove:

1. Perkins paid $16,000 for a 1987 Mercedes Benz and that he agreed to pay another $43,000 for this automobile.

2. Perkins brought his friends into the car leasing scheme.

3. Perkins started selling marijuana at North Capitol and Randolph Place.

4. An FBI Special Agent would testify that Perkins confessed to selling marijuana at Lincoln Road and R Street.

5. Perkins started selling drugs on R Street like everybody else.

6. Perkins was one of the people who kept the R Street operation going after the leaders of the Crew were no longer present following the shooting death of Alton Clea, a member of a rival gang.

7. Perkins worked from a stash house at 11 R Street which was known as "Tee–Tee's" apartment.

8. Perkins put juveniles to work selling drugs on S Street.

9. Perkins sold cocaine from his family's house at 137 Quincy Place.

10. Perkins assisted the R Street Crew by being the first person to work out the car purchasing scheme.

11. Perkins was the first person to work out the car scheme in April 1987, and that he was followed by Darryl Williams, Andre Williams, Anthony Nugent, Kevin Williams–Davis, and Jeffrey Williams.

12. Perkins recruited Christopher Williams to sell drugs at an R Street satellite location at First and Quincy.

13. Perkins was supplied with liquid PCP by Gerard Bailey.

14. Joe McGainey was a runner for Perkins and was arrested while driving a car leased to Tracy Beaty.

15. Tracy Beaty was the person who set up automobile deals so that members of the R Street Crew could have expensive cars.

16. Joe McGainey did not claim the car that he was driving when it was seized, but Perkins did claim it as part of his automobile leasing scheme.

849 F.2d 872, 875 (4th Cir.1988), that "[t]he prosecutor's opening statement should be an objective summary of the evidence reasonably expected to be produced, and the prosecutor should not use the opening statement as an opportunity to 'poison the jury's mind against the defendant' or 'to recite items of highly questionable evidence.'" 74 F.3d at 1283 (citations omitted). In other words, "[t]he prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible[,]" "scrupulously avoid[ing] any utterance that [the prosecutor] believes cannot and will not later actually be supported with [competent and reliable] evidence." *Id.* (quoting ABA STANDARDS FOR CRIMINAL JUSTICE 3–5.5, commentary at 100 (3d ed.1993)). Consequently, where the prosecutor informs the jury that the government will produce certain evidence to show a defendant's guilt and then, without good cause, fails to do so, the prosecutor fails to give a proper opening statement to the jury. Otherwise, the risk to the defendant is that the jury's mindset will be tainted, resulting in an unfair trial. *See Williams–Davis,* 90 F.3d at 506. The risk to the government is that it may have to retry the case.

 It is true, as the government points out, that during closing arguments the defense is free to call to the jury's attention the fact that the government has failed to present evidence that it promised, and to that extent its case is suspect, being weaker than the jury might originally have thought based on the prosecutor's opening statement. But this approach places an unfair burden on the defense in cases like Williams' where, as the district court noted, defense counsel may wish to avoid reminding the jury of activities for which no evidence was offered at trial. Defense counsel might well have preferred to avoid referring to the Joel Mays murder out of concern that doing so would only serve to engrain Williams' link to this violent act. Given the other evidence of Williams' involvement with the R Street Crew and its penchant for violence against rival drug operations, defense counsel would undoubtedly be concerned that a special instruction would

remind the jury that another murder had occurred and that Williams was likely implicated as a result of the evidence of his working relationship with the R Street Crew. To avoid such difficulties, an opening statement to the jury should be carefully phrased to avoid overstatement, and the prosecutor should refrain from pledging to present highly inculpatory evidence of a defendant's guilt, unless the prosecutor has carefully checked the government's witnesses to be as certain as is reasonably possible that the promised evidence will be forthcoming at trial. *See id.* at 507. The prosecutor's failure to exercise such restraint with respect to the Joel Mays murder is particularly troubling because the prosecutor in the first of the R Street Crew drug conspiracy cases, involving high-level members of the organization, was faulted on precisely the same point, failure to deliver on a promise of evidence that a defendant was implicated in the Joel Mays murder. *See id.* at 506–07. Moreover, while Williams has not presented any basis for the court to disturb the district court's finding that there was no evidence of bad faith by the prosecutor, in Perkins' case, insofar as we are aware, the government easily could have called the FBI agent to testify about Perkins' confession and it is unclear why the government failed to do so. Any prejudice to Perkins was, arguably, compounded by the number of failures of proof.

Having said this, we recognize that the complexity of large, multiple defendant drug conspiracy trials means that prosecutors may overstate their promises of evidence because of genuine confusion about which defendants are implicated in particular conspiratorial activities and as result of the unreliability or equivocation of certain witnesses. *See id.* (citing *Frazier v. Cupp,* 394 U.S. 731, 736, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969)). In some instances, the complexity of the government's case may work to a defendant's benefit. Here, for example, the jury was confronted with a dozen defendants, an indictment with over one hundred counts, and evidence of criminal activity spanning more than a decade. Keeping all of the evidence in mind, much less clearly in mind as to individual defendants, would be a difficult

task for any juror where, as here, the trial lasted for more than two months. *See Williams–Davis,* 90 F.3d at 508. For this additional reason the district court's evaluation of the three-month lapse between the opening statement and the beginning of the jury's deliberations supported its ruling that no prejudice resulted from the prosecutor's improper opening statement. Yet it cannot be gainsaid that a failure by the government to provide proof promised in the prosecutor's opening statement to the jury adds complexity where clarity is important.

■■■■ While we do not doubt the severity of the misconduct by the prosecutor during the opening statement nor ignore the potential prejudice it may have caused, given the overwhelming evidence of Williams' and Perkins' involvement in illegal drug sales and related illegal activities of the R Street Crew, we conclude that the prosecutor's failures to produce evidence to support the opening statement were harmless. *See United States v. Young,* 470 U.S. at 19, 105 S.Ct. at 1048; *Williams–Davis,* 90 F.3d at 507–508; *Small,* 74 F.3d at 1280. The district court instructed the jury that the arguments of counsel were not evidence, and absent further instruction requested by the defense, such a general instruction suffices to render error in opening statements harmless except in "particularly egregious cases." *Williams–Davis,* 90 F.3d at 507 (quoting *United States v. North,* 910 F.2d 843, 897–98 n. 33 (D.C.Cir. 1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991)). In Williams' case, the district court gave special instructions to the jury to disregard the mention of the Joel Mays murder. In Perkins' case, many of the government's failures to present promised evidence were harmless: six others concerned the same subject, namely whether he had created a scheme to acquire expensive cars to launder drug money and taught leaders of the conspiracy the technique, and two concerned his ownership of the Mercedes Benz, about which there was considerable evidence at trial. Although there is a marginal difference between demonstrating that Perkins bought expensive cars based on his drug sales and showing that he devised the idea and enlisted other members of the R Street Crew in his plans, Perkins fails to demonstrate prejudice. Accordingly, we hold that appellants have failed to show prejudice warranting reversal of their convictions. *See Frazier,* 394 U.S. at 736, 89 S.Ct. at 1423; *Williams–Davis,* 90 F.3d at 508.

D. *Failure to Inform Jury of Andre Williams' Juvenile Acquittal*

The district court refused to permit Andre Williams to cross-examine a police officer concerning his acquittal in juvenile court for the conduct that was the subject of Racketeering Act 5, which charged him with possession with intent to distribute PCP, marijuana and cocaine on November 14, 1984. Appellant asserts that the court's decision violated his Fifth, Sixth and Fourteenth Amendment rights and denied him the opportunity to present his theory that while he may have been in the presence of individuals engaged in drug activity, he was not a part of it. Appellant cites *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), which concerns the right of a defendant to call witnesses in his defense, but we view this claim as asserting a violation of the Confrontation Clause's guarantee that a defendant may engage in meaningful cross-examination of witnesses. *See Davis v. Alaska,* 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1109–11, 39 L.Ed.2d 347 (1974).

■■■■ The district court "enjoys wide discretion to control cross-examination." *Harbor Ins. Co. v. Schnabel Found. Co., Inc.,* 946 F.2d 930, 935 (D.C.Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992). Limits on cross-examination amount to an abuse of discretion only if they "result[ ] in prejudice to the substantial rights of the appellant." *Id.* The general rule with respect to the type of testimony that appellant sought to elicit is that "a judgment of acquittal is relevant to the legal question of whether the prosecution is barred by the constitutional doctrine of double jeopardy or of collateral estoppel. But once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences drawn from evidence that was admitted." *United States v. Viserto,* 596 F.2d 531, 537 (2d Cir.), *cert.*

*denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *Prince v. Lockhart,* 971 F.2d 118, 122 (8th Cir.1992) (citing cases), *cert. denied,* 507 U.S. 964, 113 S.Ct. 1394, 122 L.Ed.2d 768 (1993). The two primary reasons to exclude judgments of acquittal are (1) they are hearsay and (2) they generally are not relevant because they simply show that the government failed to prove guilt beyond a reasonable doubt. *United States v. Sutton,* 732 F.2d 1483, 1493 (10th Cir.1984), *cert. denied,* 469 U.S. 1157, 105 S.Ct. 903, 83 L.Ed.2d 919 (1985); *United States v. Jones,* 808 F.2d 561, 566 (7th Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987). They may also be more prejudicial than probative. *United States v. Kerley,* 643 F.2d 299, 301 (5th Cir.1981).

■ We find it difficult to conceive how evidence of appellant's acquittal in juvenile court supports the proposition that, although he "hung out" with friends engaged in drug dealing, he was not himself involved in the illegal conduct. According to appellant's description of the juvenile proceeding, none of the other juveniles with whom he was tried were convicted in juvenile court; thus the outcome of the juvenile proceeding does not suggest that Andre was a good guy even though the people around him were breaking the law. We see no relevant, non-hearsay purpose for testimony he sought to elicit and we conclude that the district court did not abuse its discretion in excluding the testimony.

In his briefs, appellant suggests that the transcript of the juvenile proceeding could have been used to impeach the police officer who testified about the offense during the adult conspiracy trial. Because this argument was not raised below, we consider it waived.

E. *The Validity of Andre Williams' RICO Conspiracy Conviction*

The jury convicted Andre Williams of RICO conspiracy and found that he committed four predicate acts to the RICO conspiracy. One of the predicate acts was Racketeering Act 40, which alleged maintenance of a premise for the purpose of unlawfully manufacturing, storing, distributing and using PCP. The government has conceded that the jury was not instructed on the elements of that offense and that it cannot serve as a predicate act for appellant's RICO conspiracy conviction. The jury verdict with respect to Racketeering Act 40 therefore is vacated.

■ Appellant argues that Racketeering Act 5, which charged him with possession with intent to distribute PCP, marijuana and cocaine on November 14, 1984, should also be vacated because he was found not guilty of the same offense after a juvenile proceeding in the Superior Court for the District of Columbia. Because appellant's claim rests on his prior acquittal of the offense reproduced in Racketeering Act 5, his claim is one of collateral estoppel, which "bars relitigation between the same parties of issues actually determined at a previous trial. . . ." *Ashe v. Swenson,* 397 U.S. 436, 442, 90 S.Ct. 1189, 1193, 25 L.Ed.2d 469 (1970). The government contends that the Office of the Corporation Counsel, which prosecuted the juvenile case, is not the "same party" as the Office of the United States Attorney, which is prosecuting the instant litigation, and, therefore, that the doctrine of collateral estoppel is inapplicable. We find it unnecessary to resolve this issue, however, because even if we were to accept appellant's collateral estoppel argument, it would not lead to the invalidation of his conviction for RICO conspiracy.

■ A conviction for RICO conspiracy requires that a defendant have agreed to a pattern of racketeering activity, which means at least two acts of racketeering activity. 18 U.S.C. §§ 1961(5), 1962. With Racketeering Act 40 vacated and, assuming for the moment that Racketeering Act 5 also is vacated, Andre Williams' conviction for RICO conspiracy still rests on two predicate acts: Racketeering Act 1, which charged appellant with conspiracy to distribute and possess with intent to distribute a controlled substance, and Racketeering Act 33, which charged him with possession with intent to distribute PCP and marijuana on March 24, 1988. Appellant contends that the conduct that formed the basis for Racketeering Act 33 also formed the basis for a substantive offense charged in Count 24 of the indictment, of which the jury

acquitted Andre Williams. Appellant argues that once Racketeering Acts 5 and 40 are vacated, the inconsistent verdicts with respect to Racketeering Act 33 and Count 24 leave only one certain conviction for a predicate act and, therefore, require reversal of the RICO conspiracy conviction.

Although superficially appealing, appellant's argument places far too much significance on the meaning of inconsistent verdicts. The Supreme Court has explained that "inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense should not necessarily be interpreted as a windfall to the Government at the defendant's expense." *United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984). The jury might find a defendant guilty of one offense but, either through "mistake, compromise, or lenity, arrive[ ] at an inconsistent conclusion" with respect to the other offense. *Id.* There may be error because the jury has not followed the court's instructions, "but it is unclear whose ox has been gored." *Id.*

The burden of jury lenity falls on the government, which cannot challenge an inconsistent acquittal because of the Double Jeopardy Clause of the Constitution. On the other hand, where there has been an inconsistent verdict, the criminal defendant is protected against jury irrationality and error by a review of the sufficiency of the evidence. *United States v. Vastola,* 989 F.2d 1318, 1331 (3d Cir.1993). In analyzing a claim of insufficient evidence to support a conviction, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington,* 12 F.3d at 1135–36 (emphasis in original) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We conduct such a review independent of the jury's determination on either of the counts.

In this case appellant has not challenged the sufficiency of the evidence for his conviction of Racketeering Act 33. Thus, even assuming that the verdicts are inconsistent, we see no reason to depart from the estab-lished rule that inconsistent verdicts rendered in the same proceeding ordinarily cannot be upset. *United States v. Powell,* 469 U.S. at 65–69, 105 S.Ct. at 476–79. As the jury convicted Andre Williams of at least two racketeering acts, his conviction of RICO conspiracy must stand.

## F. McKinley Board's and Gregory Thomas' Conflict of Interest Claims

Board, joined by Thomas, argues that the trial court erred when it refused to grant Board's motion for a mistrial, and later when it denied his motion for a new trial, because Board's attorney had previously represented a witness (Kenneth Sparrow) who testified on the government's behalf.

Bernard Grimm represented Board throughout this trial, and had previously represented Thomas in 1988 on charges stemming from a drug arrest. In April 1991, Sparrow testified before the R Street grand jury. In September 1991, following Sparrow's arrest for carrying a pistol without a license, Grimm began representing Sparrow. Grimm did not know that Sparrow had testified before the grand jury; indeed, Grimm asked Sparrow if he had testified, but Sparrow lied—supposedly because he did not trust Grimm to keep his confidence. Grimm withdrew from his representation of Sparrow in June 1992, when Sparrow initially appeared as a witness in the first R Street trial.

When Sparrow took the stand on October 28, 1992, to testify in *this* trial, Grimm (still representing Board) objected because of his prior representation of Sparrow, and Thomas' counsel objected on the ground that Sparrow may have learned facts about the R Street Crew from Grimm. Judge Revercomb initially decided to sever Board from the trial because of the risk that Grimm might have to appear as a witness, but at the prosecutor's urging, Judge Revercomb brought Sparrow in for *voir dire.* Sparrow was represented by counsel and, after waiving any attorney-client privilege he may have had with respect to his dealings with Grimm, testified that Grimm had not asked him any questions about other R Street defendants, and that he did not discuss activities on R

Street with Grimm. Grimm confirmed the accuracy of Sparrow's testimony.

On the basis of this testimony, Judge Revercomb reversed his decision to sever Board and directed that the jury hear Sparrow's testimony. At the close of that day's evidence, Judge Revercomb directed Grimm to check his files for "any matters" having "any relationship at all to a possible conflict in this case," but Grimm never brought anything else to the judge's attention. Although Judge Revercomb instructed Sparrow not to mention his previous representation by Grimm, Sparrow later mentioned in front of the jury the fact that he had been represented by Grimm.

A defendant can prevail on a conflict of interest claim—a type of ineffective assistance of counsel claim—under *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), if the defendant can show (1) that his lawyer acted under "an actual conflict of interest" and (2) that the "conflict had some negative effect upon his defense (defined as 'an actual lapse in representation')." *United States v. Shark,* 51 F.3d 1072, 1075–76 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 405, 133 L.Ed.2d 324 (1995). A defendant who proves an actual conflict of interest thus avoids the more stringent requirement of proving that the lawyer's "deficient performance prejudiced the defense," *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), for such prejudice is presumed, *United States v. Farley,* 72 F.3d 158, 166 (D.C.Cir.1995). An actual conflict of interest exists where a lawyer is " 'required to make a choice advancing his own [or another client's] interests to the detriment of his client's interest.' " *United States v. Bruce,* 89 F.3d 886, 893 (D.C.Cir.1996) (quoting *United States v. Litchfield,* 959 F.2d 1514, 1518 (10th Cir.1992)).

The government contends that Grimm[9] did not have a conflict of interest because "[g]iven the attorney-client waiver by Sparrow, it is not obvious, to say the least, what

constraints attorney Grimm's prior representation of Sparrow could have put on Grimm's examination of that witness." In other words, because Sparrow waived the privilege, Grimm was not placed in the position of having to choose between the interests of different clients.

But Board puts the alleged conflict a different way:

> [T]he government's use of Sparrow and the district court's failure to sever Appellant Board created a "Catch 22" for [Grimm]. Once [Sparrow] waived the privilege he had had with [Grimm], [Grimm] was theoretically in a position to impeach [Sparrow] with [Sparrow's] lie to him over the period of his representation. Although any other, non-involved attorney, once learning of the lie, might have impeached [Sparrow] with it, *this* attorney could not touch the issue without endangering Board, whose defense was to distance himself from the alleged co-conspirators.

And, the argument goes, if testimony reflected that Board and Sparrow had been represented by the same attorney, the jury would have thought that "Board and Sparrow were interrelated to the extent that they had the same lawyer at the same time, 'Mafia Style.' " Thus, Grimm was placed in a dilemma: either impeach Sparrow (about his lie to Grimm) through Grimm's own testimony and possibly create a connection between Board and Sparrow, or not impeach and lose an opportunity to discredit Sparrow, a key government witness.

It is not clear how *Board's* characterization of the dilemma manifests an *actual* conflict of interest. Grimm was faced with a strategic decision that lawyers are often faced with: placing a perhaps unfavorable witness (Grimm) on the stand. But having to make a difficult strategic decision is not the same thing as being faced with a choice between the client's interest and someone else's. Even under Board's characterization of the alleged "conflict," Grimm had only Board's interest to advance.

9. It is not apparent what conflict of interest Thomas is relying upon; after all, *his* attorney at trial had never represented Sparrow, and he points to no reason to suspect that *his* attorney

would not have vigorously defended him. (Thomas does not make an individual argument on the conflict of interest claim; he simply joins Board's argument.)

There is, to be sure, another way to characterize the conflict. At trial, Judge Revercomb was principally concerned with making Grimm a witness in the trial; in fact, he made every effort to avoid it. It could be thought that Grimm's adverse interest lay in not testifying *at all;* that is, he may have had an independent reason for not testifying (such as a fear of perjury or unfavorable treatment from the judge) which prevented him from wanting to impeach Sparrow. The conflict would thus have been between Board's possible interest in having Grimm testify and Grimm's interest in not testifying. But Board has not demonstrated that Grimm had any such personal interest; the only asserted interest is Board's strategic interest in not linking Board with Sparrow. Board simply "has failed to demonstrate that [Grimm] ever advanced his own, or another client's, interest to the detriment of [Board]." *Bruce,* 89 F.3d at 893.[10]

Without any conflict of interest, Board is left asserting a standard ineffective assistance claim under *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. But Board has not demonstrated prejudice from the alleged lapse in representation, and we thus reject this claim.

### G. *McKinley Board's Challenge to RICO Convictions*

█ Board also claims that his substantive RICO and RICO conspiracy convictions should be vacated because, under *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), RICO exceeds the power of Congress to regulate interstate commerce. According to Board, RICO is unconstitutional as applied to him because he was involved in a "very localized" business. The evidence established, however, that the organization had purchased between nine and ten million dollars of cocaine from Columbian drug dealers in New York (and that one member of the organization had traveled to New York on several occasions to pick up the cocaine); that the organization had purchased 150 kilograms of cocaine from Los Angeles (and that members of the organization had traveled to Los Angeles to pick up the cocaine); and that the organization's PCP supplier was in California. And 18 U.S.C. § 1962(c) contains a jurisdictional element: the RICO enterprise must be "engaged in" or have activities "which affect ... interstate or foreign commerce." The statute thus "contains a requirement that [the offense] be connected in any way to interstate commerce," *Lopez,* 514 U.S. at 551, 115 S.Ct. at 1626, and is "directed specifically at a particular type of commercial activity," *United States v. Hawkins,* 104 F.3d 437, 439–40 (D.C.Cir.1997) (holding that the provision of the Drug Free School Zones Act making possession with intent to distribute drugs within 1,000 feet of a school illegal is within Congress' power). Under *Lopez* and *Hawkins,* the RICO statute is within Congress' Commerce Clause power.

### III.

Appellants also raise various joint and individual claims to their sentences. We consider first appellants' objection to the replacement of the trial judge, then lay out the general legal framework for attributing drug amounts to conspirators, and consider individual sentencing claims.

### A. *Replacement of Trial Judge*

Appellants jointly argue that Judge Hogan improperly sentenced them because the "case lasted three months ... many of the government witnesses contradicted not only each other, but themselves as well, and ... the sentencing court could not make any credibility determinations because the sentencing judge saw none of the government's case.... [T]he sentencing judge *was not in*

---

**10.** Board's reliance on *Derrington v. United States,* 681 A.2d 1125 (D.C.App.1996), is misplaced, for there the attorney's current client (Derrington) was a possible informant in a trial involving another current client (Taylor). The attorney was thus faced with a conflict between Derrington, who had a possible interest in cooperating with the government in Taylor's trial in exchange for leniency, and Taylor, who had an interest in Derrington's *not* cooperating. Significantly, the attorney never discussed with Derrington the option of cooperating with the prosecutors in *Taylor's* trial in exchange for lenient treatment in *his* trial. *See id.* at 1128, 1134. No such conflict exists here.

*a position to determine each individual's criminal liability based solely on a reading of the transcript."* (Emphasis added). Insofar as this is an argument that Judge Hogan could not sentence appellants because he did not preside over the entire trial or because he did not sufficiently familiarize himself with the record, it does not provide a basis for reversal.

■ Rule 25 provides:

**(a) During Trial.** If by reason of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge regularly sitting in or assigned to the court, upon certifying familiarity with the record of the trial, may proceed with and finish the trial.

**(b) After Verdict or Finding of Guilt.** If by reason of absence, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties; but if that judge is satisfied that a judge who did not preside at the trial cannot perform those duties or that it is appropriate for any other reason, that judge may grant a new trial.

FED. R.CRIM. P. 25. Although we have not directly addressed the scope of review of a decision to proceed under Rule 25(a), we have declined to find an abuse of discretion in a decision *not* to substitute a new judge under Rule 25(a), *United States v. Lynch,* 598 F.2d 132, 135–36 (D.C.Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979), and other courts have held that the decision to proceed with a case under Rule 25(b) is a matter committed to the broad discretion of the successor judge, *see United States v. Whitfield,* 874 F.2d 591, 593 (8th Cir.1989); *United States v. Spinney,* 795 F.2d 1410, 1413 (9th Cir.1986). We will thus review Judge Hogan's decision to proceed under Rule 25(a) only for abuse of discretion.

■ Although the complexity of a case and the abundance of evidence typically determine the extent of the review necessary to familiarize a successor judge with the record, *compare United States v. Makes Room,* 49 F.3d 410, 415 (8th Cir.1995) (in a "relatively straightforward case . . . there is no requirement that the sentencing judge review a transcript of the trial") *with United States v. Bourgeois,* 950 F.2d 980, 987–88 (5th Cir. 1992) (in complex tax fraud conspiracy, judge "capable of assessing the credibility of the witnesses and the evidence at trial" where judge reviewed transcript of the trial and pretrial hearings and sentencing materials), and this was a long and relatively complex trial, Judge Hogan did not abuse his discretion in proceeding as he did. Indeed, there appears to be little more that Judge Hogan could have done to familiarize himself with the record: Judge Hogan read all 44 volumes of the trial transcripts, all pre-trial and trial motions, and all motions rulings; he reviewed some of the physical evidence and Judge Revercomb's chamber notes; and he was briefed by Judge Revercomb and Judge Revercomb's law clerk.

At the heart of appellants' argument is the contention that the credibility of the government's witnesses was of paramount importance and that Judge Hogan was incapable of assessing the credibility of these witnesses. But Judge Hogan found, in sentencing Andre Williams, that to the extent that witnesses contradicted one another, "they conflict[ed] with each other because they were talking about different aspects of the case and because of the different levels of involvement they themselves had." Appellants have not contested this finding, nor have they identified on appeal any specific inconsistencies. Judge Hogan did not abuse his discretion in the manner in which he replaced Judge Revercomb.

### B. *Relevant Conduct*

■ Under the Sentencing Guidelines, the district court determines a defendant's base offense level by delineating his "relevant conduct," U.S.S.G. § 1B1.3; in drug-related offenses the base offense level depends on the amount of drugs involved in the "relevant conduct." *See* U.S.S.G. Ch. 2, Pt. D. In the case of jointly undertaken criminal activity, "there are two substantive limita-

tions on a defendant's responsibility for acts undertaken by co-conspirators: Those acts must be 'in furtherance of' the same conspiracy to which the defendant has agreed, and they must be reasonably foreseeable to the defendant." *Childress*, 58 F.3d at 722. Because only the conduct of co-conspirators that is "in furtherance of" the conspiracy may be attributed to a particular defendant, "proper attribution requires analysis of the scope of the conspiracy that the defendant has joined," *id.*; the scope of a defendant's conspiratorial agreement depends on whether "the evidence establish[es] a single conspiracy, in which each defendant has joined in the overall scheme, or multiple conspiracies involving separate agreements [and whether] there are any 'side deals' by co-conspirators that are not attributable to the conspiracy joined by the defendant." *Id.* And whether drug transactions entered into by co-conspirators were reasonably foreseeable to a defendant "depends on factual findings regarding reasonable foreseeability as it relates to each appellant's conspiratorial participation." *Id.*

■■■ A district court cannot simply assume reasonable foreseeability or scope; rather, the district court is required to make "particularized findings" about both the scope of the agreement and "the basis on which it finds the amount of drugs reasonably foreseeable to th[e] individual defendant." *Id.* (citing *United States v. Edmond*, 52 F.3d 1080, 1104 (D.C.Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995); *United States v. Anderson*, 39 F.3d 331, 351–53 (D.C.Cir. 1994), *rev'd on other grounds*, 59 F.3d 1323 (D.C.Cir.1995) (en banc); *United States v. Saro*, 24 F.3d 283, 288–90 (D.C.Cir.1994), *cert. denied*, — U.S. ——, 117 S.Ct. 375, 136 L.Ed.2d 264 (1996)). This requirement of findings is a "strict procedural mandate: Even where the evidence likely supports the conclusion that there was a single conspiratorial agreement joined by all the defendants, the district court at sentencing must spell out in some detail the evidentiary basis for this conclusion." *Childress*, 58 F.3d at 722. A jury verdict that convicts defendants of participation in a single conspiracy does not eliminate the requirement of these individu-

alized findings, *id.*; when facing a claim of factual inaccuracy, the district court cannot satisfy this requirement by simply adopting the presentence report, *United States v. Graham*, 83 F.3d 1466, 1477, 1480 (D.C.Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 993, 136 L.Ed.2d 874 (1997), and the failure to make such findings is harmless "*only* where the district court ha[s] made a specific finding that the individual defendant had personally handled the requisite amount of drugs in furtherance of the conspiracy." *Childress*, 58 F.3d at 724 (emphasis in original). Where specific findings have been made, however, a district court's decision to attribute a particular quantity of drugs to a defendant is reviewed for clear error. *United States v. Badru*, 97 F.3d 1471, 1477–78 (D.C.Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 1700, — L.Ed.2d —— (1997), *cert. denied in part sub nom. Fashina v. United States*, — U.S. ——, 117 S.Ct. 1327, 137 L.Ed.2d 488 (1997). Although "caution should be properly exercised in the attribution area," even a "brief" finding can be sufficient if, "when viewed in context, it is more than simply a generalized or conclusory finding that [the defendant] was involved in the conspiracy." *Id.* at 1477–78 & n. 4.

### C. *Derrin Perkins*

For purposes of sentencing, the district court assigned Derrin Perkins a base offense level of 43 by attributing to him all of the drugs handled during the duration of the conspiracy, from 1983 to 1991, and adding one level for the employment of a person under 18 years of age to distribute a controlled substance. *See* U.S.S.G. §§ 2D1.1(a)(3)(c)(1), 2D1.2(a)(3) (1992). The court added a two-level enhancement for possession of a firearm, *see id.* § 2D1.1(b)(1), and a two-level enhancement for participation as a manager or supervisor in the conspiracy. *See id.* § 3B1.1(c). Perkins' total offense level was 47, which was treated as 43 under the Guidelines, pursuant to U.S.S.G. Ch. 5, Pt. A. With a criminal history category of II, the Guidelines sentencing range for all three of Perkins' convictions was life imprisonment, and the district court sentenced him to three concurrent life sentences. On

appeal, Perkins challenges the amounts of drugs attributed to him pursuant to his relevant conduct in the conspiracy and the weapons enhancement. We conclude that his challenges lack merit.

 Perkins maintains that the district court failed to examine the scope of his conspiratorial agreement and to determine whether the amount of drugs attributed to him was reasonably foreseeable to him, as required by *Childress,* 58 F.3d at 721–23, and its progeny.[11] He also contends that the court erred in attributing to him the drugs that were distributed prior to 1989 in light of evidence that he was no more than a customer of the conspiracy before then. The presentence report set forth the trial evidence generally, and separately discussed each defendant.[12] Perkins filed objections to the presentence report and at the sentencing hearing presented the testimony of Officer Quinton Brooks, a friend and neighbor of Perkins'. Brooks testified that although he saw Perkins five days a week, he never saw him involved in any drug activity but, on the other hand, that he had seen Perkins driving a green Mercedes Benz and was unaware that Perkins had a job.[13]

The district court addressed each of Perkins' contentions and concluded that "[t]he recitation of the conduct of the organization in which Mr. Perkins was found to be involved by the Jury ... seems to support ... the findings in the presentence report that [Perkins] was engaged in these activities." The court referred, by name, to the testimony of Witherspoon, Cherry, and Brookhold-

er[14] with regard to the amount of drugs involved in the conspiracy and its link to Perkins, and found that Perkins "was engaged in a conspiracy with the others and was engaged in substantial distribution activities along with Odenga Dyson for distributing PCP." The court relied upon the evidence of Perkins' use of the green Mercedes Benz at a time when he was unemployed, and referred to the testimony of several witnesses to the effect that Perkins associated with the other defendants socially as well as conspiratorially. The court found the testimony of Rosalind Cherry regarding the ten drug deliveries to be "particularly telling," and noted the testimony of Officer Kenneth Parker that Perkins was tied to the R Street Crew, as well as testimony of other witnesses who referred to Odenga Dyson's delivery of drugs to Perkins. Although the district court concluded that Perkins was not one of the major directors of the R Street Crew on a level with Anthony Nugent or Kevin Williams–Davis, the court concluded that he was substantially involved with the organization's distribution of drugs, even though at times Perkins "was off on his own selling drugs." The court specifically found that:

> [T]here is evidence that Mr. Perkins was engaged in the distribution of drugs back in '85 from Lieutenant Melvin Scott and right through '89, as the Jury found, with the use of juveniles to distribute drugs and Dax Nelson's testimony that Mr. Perkins was a distributor and a supplier of major amounts of PCP and cocaine to several people at different locations.

11. *See, e.g., United States v. Booze,* 108 F.3d 378, 380–85 (D.C.Cir.1997); *United States v. Dudley,* 104 F.3d 442, 446–48 (D.C.Cir.1997); *United States v. Badru,* 97 F.3d at 1476–79; *United States v. Graham,* 83 F.3d at 1479–80.

12. The paragraph on Perkins states:

> Derrin A. Perkins was a runner for and then an associate of the R Street organization. Information obtained from the Government revealed the defendant was selling marijuana and cocaine for the Organization in 1985. He branched out on his own by 1986 and the R Street organization became a source in which he would purchase large quantities of drugs. The defendant had his own runners in and around Quincy Place, N.E. They were selling

marijuana and phencyclidine. Testimony revealed Mr. Perkins was selling cocaine in the R Street area in 1985, as well as marijuana and PCP.

13. Perkins also objected to the application of the Sentencing Guidelines to conduct occurring before the Guidelines had become effective, *see infra* pp. 272–273, and to the failure of the presentence report writer to conduct an independent investigation of the evidence. He does not raise these contentions on appeal.

14. This appears to be a reference to the testimony of Alvin Buckhalter, the R Street Crew's Los Angeles narcotics supplier, who testified that he recognized Perkins from having seen him on R Street talking with Kevin Williams–Davis.

It seems to the Court this is the kind of evidence that makes it clearly foreseeable to the Defendant that the amount of drugs that had been assessed in this drug ring are fairly attributable to the Defendant.

In addition, the district court referred to Sparrow's testimony in concluding, "independently of the Jury's verdicts," that all the drugs distributed by the conspiracy, as calculated in the presentence report, were reasonably foreseeable to Perkins, given his position and the fact that the drugs were being sold constantly in the area in which he operated. The court noted that, in order to assure the success of the R Street Crew, Perkins assisted in making deliveries and selling drugs, and that he also used the organization for his own benefit, by purchasing drugs wholesale and reselling them for personal profit.

The district court's findings were more extensive than those found to be inadequate in *Childress,* and more thorough than those in *United States v. Anderson,* 39 F.3d 331 (D.C.Cir.1994), *rev'd in part on other grounds,* 59 F.3d 1323 (D.C.Cir.) (in banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995), where the district court simply adopted a conclusory paragraph from the presentence report. The district court outlined the evidence showing the nature of Perkins' involvement in the conspiracy and addressed Perkins' objections to the presentence report. Although the findings were not as detailed as those deemed to be sufficient in *Booze,* 108 F.3d at 380–85, and *Badru,* 97 F.3d at 1476–79, we are unpersuaded that greater specificity was required here. We expect, as a result of our suggestion in *United States v. Dudley,* 104 F.3d 442, 447 (D.C.Cir.1997), that in the future the government and the defense will submit proposed findings to the district court, and that henceforth the district court's findings will be more detailed. But from our review of the district court's findings it is clear that the court examined the specific nature of Perkins' changing role in assisting in the workings of the R Street Crew and the benefits he derived in terms of narcotics procurement and protection for his own drug activities. Our review also indicates that the district court

found that Perkins was aware of the significance of his access to expensive cars and that his role gave him firsthand knowledge of the scope and location of the organization's ongoing drug activities.

Although the attribution of such large quantities of drugs may suggest need for detailed findings, we conclude on balance that the district court's findings adequately addressed Perkins as an individual conspirator and did not simply lump him together with other members of the R Street Crew. Having captured the nature of his individual activity, both within and outside the conspiracy, the district court's findings adequately addressed the scope of Perkins' conspiratorial agreement and the reasonable foreseeability to him of all the drugs distributed by the R Street Crew. *See Booze,* 108 F.3d at 381.

■ Perkins also challenges the two-level enhancement of his sentence for use of firearms in the conspiracy. The district court found that "[t]here was no question that there were firearms used during the conspiracy, Dyson supplied [Perkins] with PCP directly, was armed, and [Perkins] was aware of that." The court also found that "[g]uns were reasonably foreseeable," and that Perkins had actual knowledge that guns were used during the course of the conspiracy.

Perkins can hardly dispute that there was abundant evidence demonstrating that he handled large quantities of drugs and that the R Street Crew engaged in violent activity involving guns when the organization sought to crush rival drug operations. Although there was no direct evidence that Perkins knew that Odenga Dyson was armed when he delivered drugs to Perkins, direct evidence was not required. *See United States v. Salamanca,* 990 F.2d 629, 635 (D.C.Cir.), *cert. denied,* 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993); *United States v. Lawson,* 682 F.2d 1012, 1017 (D.C.Cir.1982). Perkins knew the value of the drugs that Dyson was delivering, and there was ample circumstantial evidence, such as the volume of the organization's drug activity, *see supra* pp. 237–238, to support a finding that Perkins was aware of the use of guns in the conspiracy. *See Childress,* 58 F.3d at 725. The government also provided direct evi-

dence that Perkins assisted in removing a bullet lodged in Williams–Davis' leg after a shootout in which the R Street Crew tried to wipe out a rival drug operation, and that he continued thereafter to associate himself with the conspiracy. Hence, the district court reasonably could conclude that Perkins knew that other members of the R Street Crew, including Williams–Davis, were armed and that the use of guns was reasonably foreseeable to Perkins given the R Street Crew's repeated violent interchanges with rival operations. For these reasons, Perkins' sentencing challenges fail.

### D. *Andre Williams*

Andre Williams was convicted of RICO conspiracy (Count 2) and narcotics conspiracy (Count 3). The district court assigned him a base offense level of 42 by attributing to him all of the drugs handled by the conspiracy during its duration from 1984 through 1990, *see* U.S.S.G. § 2D1.1(a)(3)(c)(1), then added a three-level enhancement for participation as a manager or supervisor in the conspiracy and a two-level enhancement for possession of a firearm. *See* U.S.S.G. §§ 2D1.1(b)(1), 3B1.1(b). His total offense level was 47, which is treated as 43 under the Guidelines. U.S.S.G. Ch. 5, Pt. A, comment. to the Sentencing Table (note 2). With a criminal history category of I, the Guidelines imprisonment range for both RICO conspiracy and narcotics conspiracy was life imprisonment and appellant was sentenced to two concurrent life sentences.

Andre Williams challenges (1) the attribution to him as relevant conduct of all the drugs handled throughout the R Street Crew's six-year existence; (2) the enhancement of his base offense level for his role as a manager or supervisor in the conspiracy; (3) the attribution as relevant conduct of all drugs handled by the conspiracy before he turned eighteen years old, an objection joined by Donnell Williams; (4) the attribution as relevant conduct of drugs handled by the conspiracy after he allegedly withdrew from the conspiracy; and (5) the district court's refusal to grant him a downward departure based on his youthful lack of guidance.

### 1. *Attribution of Drugs as Relevant Conduct*

The district court held Andre Williams accountable for all of the criminal conduct of the R Street Crew, specifically relying on (1) the jury's guilty verdicts for narcotics conspiracy, RICO conspiracy and the RICO conspiracy predicate act involving maintenance of drug premises, (2) the testimony of Margaret R. Williams and other cooperating witnesses, (3) appellant's excessive spending, and (4) appellant's involvement in the murder of Joel Mays and in various street crimes.

■■■ The district court found that the jury verdicts showed "the defendant's involvement in the racketeering offense conspiracy ... as well as the narcotics offense" and that "he was involved in the maintenance of a stash house in the home of Margaret R. Williams, his aunt, as charged." 4/21/94 Tr. at 38. The court inferred from "the jury's conduct alone ... that the jury believed [Andre Williams] was involved at an important level in the operation of the narcotic and RICO conspiracy...." *Id.* Appellant contends that reliance on the jury verdicts for the purpose of determining the amount of drugs that should be attributed to him as relevant conduct was clear error because the jury was instructed that a defendant need not be a major player in order to be convicted of the conspiracy counts and because the jury was never instructed on the elements of the offense of maintaining a premise.

It is indeed true that, according to the instructions delivered to the jury, Andre Williams could have been convicted of the conspiracy offenses without the jury finding that the conduct of his co-conspirators was foreseeable. A sentencing court may in appropriate circumstances consider a jury verdict, *see Childress*, 58 F.3d at 722, but the court here acted in error when it read into the conspiracy verdicts any conclusion about the extent of appellant's involvement with the R Street Crew or his knowledge of its illegal activities. Moreover, the jury was never instructed on the elements of Racketeering Act 40 in the indictment, which charged appellant with maintaining a drug premise. As the government properly concedes, Williams'

conviction for maintaining a premise therefore is invalid and the court should not have relied on it at all.

■ The district court's erroneous consideration of these verdicts does not automatically require us to remand the case for resentencing, however. *United States v. Root,* 12 F.3d 1116, 1121 (D.C.Cir.1994). "[I]n determining whether a remand is required ..., a court of appeals must decide whether the district court would have imposed the same sentence had it not relied upon the invalid factor or factors." *Williams v. United States,* 503 U.S. 193, 203, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992); *see* 18 U.S.C. § 3742(f)(1). We look to the district court's other findings at sentencing to evaluate whether on that record as a whole, the error was harmless.

■ In addition to mentioning the convictions, the district court recounted how cooperating witness Margaret R. Williams

> observed [Andre Williams] in drug transactions ... early on in this matter [and] stored drugs for them.... [S]he had seen [Andre Williams] in the home in connection with drug trafficking. Although she never said that he went down apparently to the basement and actually packaged the drugs, [she testified] that he was there when others were packaging and would speak to them about what was going on.

4/21/94 Tr. at 39. The court determined that "[t]here is no question her home was a center for the storage and manufacture of large quantities of drugs, both PCP and marijuana...." *Id.* The court also referred to testimony by Margaret R. Williams that "[Andre Williams] went forward for several years in this operation, and even toward the end, after he had a job and perhaps you could hope that he had gotten out of the

situation, he went and talked to Margaret [R.] Williams concerning her proposed testimony...." *Id.* at 41. The district court relied on Margaret R. Williams' testimony as evidence of appellant's conduct, his relationship to and knowledge of the conspiracy and the duration of his involvement in the conspiracy.

Appellant challenges the court's reliance on Margaret R. Williams' testimony to support any inference that he was involved in witness intimidation on behalf of the conspiracy.[15] We see no error in the district court's mention of appellant's discussion with Margaret R. Williams. The district judge did not characterize the discussion as evidence of witness intimidation, but rather evidence that Andre Williams continued to associate with members of the conspiracy and remained concerned about the conspiracy's affairs for its entire duration.

The district court also explained that the collective testimony of Kenneth Sparrow, Maurice Brooks, Charles Smith, and Dax Nelson

> establishes that Mr. Andre Williams was identified as an operator of this ring along with his brothers on a lesser level than as a leader, that is at the top supervisory level, but certainly as a lieutenant, where he went from selling drugs to delivering drugs to collecting monies to enjoying the success of the ring by engagement of the Mercedes–Benz, and to helping to enforce the ring's operational areas in the sense of the Joel Mays involvement ... having ammunition in his room and guns in the house ... to protect the stash and the monies. There's also evidence that he directed the operation for a short time when his brothers were out of town.

---

15. The trial record indicates that Margaret R. Williams described an encounter with Andre Williams' mother in which the mother recommended that the witness "not say anything" to the government. The following exchange then took place between Ms. Williams and the prosecutor:

> Q: ... [D]id you speak to anyone else?
> * * * * * *
> A: I believe Andre had came over the next day?

> Q: And what was it you said to Mr. Andre Williams?
> A: He asked the same thing [ ] what did they ask me, and I told him. He was saying, well, they don't, you know, have nothing and they don't have no proof, they don't have no evidence.
> Q: And what, if anything, did he advise you to do?
> A: He did not advise me to do anything.
> 11/5/92 Tr. at 62.

4/21/94 Tr. at 40. Appellant challenges the court's reliance on the testimony of these government witnesses because it did not tie him to a specific quantity of drugs and because the witnesses made conflicting statements.

Appellant's contention that the witnesses did not connect him to a specific quantity of drugs sold by the conspiracy misses the point of the relevant conduct inquiry. A defendant need not have touched every gram of PCP-laced marijuana and cocaine base in order for it to be attributed to him as relevant conduct. The court relies on evidence of a defendant's relationship to and involvement with the conspiracy in order to draw permissible inferences regarding his knowledge and agreement to be part of a drug or RICO conspiracy and the foreseeability of his co-conspirators' conduct. The court's findings concerning the nature and extent of the defendant's relationship to the conspiracy are used as a basis for a conclusion about whether he should be held vicariously liable for the conduct of his co-conspirators. In a chain conspiracy such as the R Street Crew, extensive involvement in the conspiracy over the life of the operation could lead the court to conclude that one member should be held accountable for all of the drugs sold by the entire conspiracy. Thus, for example, the district court's reference at sentencing to the presence of guns in appellant's house is not intended to link him to any particular quantity of drugs, but rather to describe appellant's relationship to the conspiracy, his level of involvement and his knowledge of the conspiracy's activities. Similarly, the sentencing court's description of Williams' "purchase of a Mercedes automobile at a very young age, paying over $12,000 in repairs for it in cash, at least that, almost $14,000 within a year," 4/21/94 Tr. at 39, and "the trips he's taken to Las Vegas and Atlantic City as a very young man, a teenager," *id.*, may not be directly traceable to the sale of a particular quantity of drugs, but it does support the district court's inference that Andre Williams, a teenager with no source of income except the sale of drugs, was receiving profits from the conspiracy.

Appellant argues that the testimony of the cooperating witnesses in this trial, however, was either internally inconsistent or in conflict with the testimony of other witnesses and, because the district court did not actually hear the testimony of the government's witnesses, it should have been wholly disregarded. The specific testimonial conflict identified by appellant involves some witnesses calling him a seller, some calling him a runner, some calling him a lieutenant and some saying that he was not involved at all. Our review of the sentencing record shows that the district court did not rely in assessing Williams' accountability on the "title" that the various witnesses used to describe his involvement with the R Street Crew. The court's findings refer rather to specific activities in which witnesses observed Andre Williams engaging and which, in the court's judgment, led to the conclusion that Andre Williams was a significant player in the R Street Crew's operation for many years. Appellant has identified no conflicting testimony about these actions described by the witnesses and we find no error in the court's reliance on their uncontradicted testimony to show Andre Williams' role in the conspiracies.

Finally, in discussing Williams' involvement, the court referred to appellant's "history of [ ] arrests on the street along with others who were identified as co-conspirators in this case in distributing of drugs, ... [and] his history of involvement with the Joel Mays matter, the killing...." 4/21/94 Tr. at 39. Appellant objects to the district court's mention of the Joel Mays murder because the government did not present any evidence regarding the murder at trial. Andre Williams' presentence report recounts that on March 26, 1988, Joel Mays was approached by Neil Hilliard, Ronnie Isler and Andre Williams and was told that he could not distribute drugs in their area. According to the report, when Mr. Mays refused to comply Mr. Isler got a gun and shot Mr. Mays. In connection with the murder Andre Williams entered a plea, without admitting his guilt, to the charge of simple assault and possession of a prohibited weapon. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (permitting guilty plea without an admission of guilt so

long as there is a factual basis for the plea). Under most circumstances, a sentencing court may rely on undisputed facts reported in a presentence report and objecting to the report's legal conclusion does not suffice to dispute the factual assertions on which that conclusion rests. *See United States v. Pinnick,* 47 F.3d 434, 437 (D.C.Cir.1995). Appellant has not challenged the accuracy of the report's description of his involvement with Joel Mays. Accordingly, the sentencing court was permitted to consider it as evidence of appellant's involvement in the Crew's efforts to protect its drug territory.

To sum up: our assessment of the district court's sentencing determination indicates that the court made one error; it inferred a higher level of involvement in the conspiracy from the jury verdicts than was permissible. Nevertheless, any conclusions that the district court erroneously drew from the jury verdicts could properly be drawn from the other evidence relied on by the court. That evidence proved by a preponderance of the evidence that Andre Williams was involved in the selling, storage and distribution of drugs and the protection of inventory and territory, that he enjoyed the conspiracy's profits, that he communicated with upper-level members of the Crew and that he was involved in managerial activities. Extensive involvement of this kind over the life of the conspiracy supports the sentencing court's conclusion that Andre Williams agreed to participate to the fullest extent in the R Street Crew conspiracy and that, accordingly, the drug dealing conduct of his co-conspirators was reasonably foreseeable and should be attributed to him.

### 2. *Managerial Enhancement*

The Sentencing Guidelines provide for an enhancement of the base offense level if the district court finds that "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive...." U.S.S.G. § 3B1.1(b). In considering whether a defendant was a manager or supervisor, the sentencing court looks at the defendant's exercise of decision-making authority, the nature of his partic-ipation in the commission of the offense, his recruitment of accomplices, any claimed right to a larger share of the fruits of the crime, the degree of his participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control or authority he exercised over others. U.S.S.G. § 3B1.1, comment. (note 4). The district court enhanced Andre Williams' base offense level after determining that he functioned as a lieutenant with managerial responsibilities. In applying the enhancement to Williams, the court referred to the same evidence that it relied on for its relevant conduct determination.

■ Appellant objects that the court cannot conclude that he supervised others because the jury acquitted him of Count 18, which charged him with employment of persons under the age of eighteen for the purpose of distributing drugs. Appellant insists that the acquittal demonstrates that the jury rejected testimony concerning his role as a supervisor. The Sentencing Guidelines instruct the sentencing court to consider the numerous factors listed above, no one of which is determinative. An acquittal on any one count concerning supervisory conduct proves only that the government did not prove that particular count beyond a reasonable doubt. It does not mean that the court cannot draw on the evidence presented at trial in support of that count to determine by a preponderance of the evidence under the enumerated factors that Andre Williams was a lieutenant or manager in the R Street Crew. *United States v. Watts,* — U.S. —, —, 117 S.Ct. 633, 634, 136 L.Ed.2d 554 (1997). Moreover, as we have discussed, other evidence at trial demonstrated that Andre Williams participated in the conspiracy at a significant level, that he was involved in processing, packaging and distributing drugs, that he communicated with the leaders of the conspiracy and was aware of their activities, that he enjoyed the profits of the drug sales, that he sought to protect the Crew's territory, and that he played a managerial role when his brothers were out of town. Applying a deferential standard of review in light of the district court's familiarity with the entire case and its corresponding ability to assess the relative culpability of the

individuals involved in the conspiracy, *United States v. Williams*, 891 F.2d 921, 926 (D.C.Cir.1989), we see no error in the application of an enhancement of appellant's base offense level for his role as a manager or supervisor in the R Street Crew conspiracy.

### 3. *Attribution of Drugs Handled by the Conspiracy Prior to Appellants' Eighteenth Birthdays*

Andre Williams, joined by Donnell Williams, contends that the Sentencing Guidelines do not permit him to be held vicariously liable for the conduct of co-conspirators in furtherance of the R Street Crew conspiracy that took place prior to his reaching the age of eighteen. Andre Williams joined the conspiracy in 1984 when he was fifteen years old. He turned eighteen on May 15, 1987, and was twenty-two years old when the original indictment in this case was filed. Donnell Williams became a member of the conspiracy when he was eleven years old. He turned eighteen on December 18, 1989, and was nineteen when he was indicted for this offense.

▮ Appellants cite Application Note 2 to U.S.S.G. § 1B1.3, which states that "a defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant *joining* the conspiracy, even if the defendant knows of that conduct." (emphasis added). The agreement to join is central to conviction for a drug conspiracy because neither common law nor the drug conspiracy statute require proof of any overt act by a conspirator in furtherance of the conspiracy. *United States v. Shabani*, 513 U.S. 10, 12–14, 115 S.Ct. 382, 384, 130 L.Ed.2d 225 (1994); 18 U.S.C. § 846. Similarly, in a RICO conspiracy, it is the act of forming the conspiracy to commit a substantive RICO violation that constitutes the crime. 18 U.S.C. § 1962(d). "[T]he criminal agreement itself is the actus reus. . . ." *Shabani*, 513 U.S. at 16, 115 S.Ct. at 386.

Appellants analogize the agreement to join a conspiracy to the agreement to be bound by a contract and point out that, under generally recognized legal principles, individuals under the age of eighteen are not considered to have the "capacity" to enter a contract. RESTATEMENT (SECOND) OF CONTRACTS §§ 12, 14 (1981). Because interpretive Guidelines' commentary ordinarily is considered authoritative, *Stinson v. United States*, 508 U.S. 36, 42–46, 113 S.Ct. 1913, 1917–20, 123 L.Ed.2d 598 (1993), Andre and Donnell Williams contend that the district court misapplied the Guidelines by attributing to each the drugs handled by the conspiracy before he reached age eighteen and gained the requisite capacity to "join" the conspiracy.[16]

▮ The application note relied on by appellants was added to the Guidelines in 1994 in order to

> clarif[y] the operation of § 1B1.3 with respect to the defendant's accountability for the action of other conspirators prior to the defendant joining the conspiracy. The amendment is in accord with the rule stated in recent case law. *See, e.g., United States v. Carreon*, 11 F.3d 1225 (5th Cir. 1994); *United States v. Petty*, 982 F.2d 1374, 1377 (9th Cir.1993); *United States v. O'Campo*, 973 F.2d 1015, 1026 (1st Cir. 1992). . . .

U.S. Sentencing Guidelines Manual app. C, amend. 503 (1995). Although appellants were sentenced under a version of the Guidelines issued prior to 1994, a "clarifying" amendment to the Guidelines generally has retroactive application. *See, e.g., United States v. Carrillo*, 991 F.2d 590, 592 (9th Cir.), *cert. denied*, 510 U.S. 883, 114 S.Ct. 231, 126 L.Ed.2d 186 (1993). The cases relied on by the Sentencing Commission in crafting Application Note 2 to U.S.S.G. § 1B1.3 reasoned that the use of the phrase "reasonably foreseeable" in the definition of "relevant conduct" implies a prospective understanding that something may occur. *Carreon*, 11 F.3d at 1234–35; *Petty*, 982 F.2d

---

**16.** The government contends that the court need not reach this issue with respect to Andre because the drug calculation methodology used in the presentence report and accepted by the district court would result in a sufficiently high calculation of drugs to give Andre a base offense level of 42 solely for his post-majority conspiratorial conduct. We cannot agree because the district court never specified the quantity of drugs handled by the conspiracy prior to Andre's eighteenth birthday and the quantity handled afterward.

at 1376–77; *O'Campo*, 973 F.2d at 1025–26. The courts concluded that the point at which foreseeability is determined is the time that the defendant agreed to become part of the conspiracy, because it is only at that point that what is foreseeable coincides with the defendant's agreement about the scope of the conspiracy. *See Carreon*, 11 F.3d at 1235–36; *Petty*, 982 F.2d at 1377; *O'Campo*, 973 F.2d at 1026. Neither the application note, nor the amendment explaining its addition to the Guidelines, nor the cases cited in the amendment discuss at what point a juvenile has the capacity to "join" a conspiracy.

Nor do we find support in the common law or relevant legislation for the proposition that the legal fiction employed in contract law to protect minors from their immaturity and inexperience in commerce, and from the snares of unprincipled people who would exploit them, applies as well to their engagement in criminal activity. In criminal cases at common law age was only relevant in the application of legal presumptions. It was conclusively presumed that a child under the age of seven years could entertain no criminal intent and thus was incapable of committing a felony. *Allen v. United States*, 150 U.S. 551, 558, 14 S.Ct. 196, 198, 37 L.Ed. 1179 (1893). A child between the ages of seven and fourteen was also presumed incapable of entertaining criminal intent, but the presumption was rebuttable. *Id.* No presumption existed in favor of an accused older than fourteen years old.

The FJDA carved out an exception to these common law principles in order to encourage rehabilitation of juveniles, but the Act did not change the common law conception that a juvenile was capable of committing a criminal act. Under the FJDA, violations of law committed by a person younger than eighteen are considered acts of juvenile delinquency rather than crimes. A person not yet twenty-one who committed such an act ordinarily may not be prosecuted as an adult in federal court and generally is placed into state juvenile court systems or proceeded against in a juvenile delinquency proceeding in the district court. 18 U.S.C. § 5032. This is because he is considered still rehabilitatable outside the regular criminal process. Such defendants receive special rights and immunities, are shielded from publicity, are confined apart from adult criminals and are protected from certain consequences of adult conviction. *See In re Sealed Case*, 893 F.2d 363 (D.C.Cir.1990). Adjudication as a juvenile delinquent results in an adjudication of a status rather than in a conviction of a crime. The Sentencing Guidelines expressly exclude application of the Guidelines to persons found delinquent under the FJDA. U.S.S.G. § 1B1.12. Conversely, a person who has reached twenty-one can be criminally indicted for the acts committed under eighteen because it is assumed he can no longer benefit from FJDA protections.

■ There is no question, however, that juveniles may be prosecuted for juvenile delinquency based on violations of federal law that would constitute crimes of conspiracy if committed by adults. *E.g., United States v. De Leon*, 768 F.2d 629 (5th Cir.1985); *United States v. J.H.H.*, 22 F.3d 821 (8th Cir.1994); *United States v. Three Juveniles*, 886 F.Supp. 934 (D.Mass.1995); *In re Daniel S.*, 103 Md.App. 282, 653 A.2d 512 (Spec.App.1995); *In re Elieser C.*, 14 Conn. App. 445, 541 A.2d 528 (1988). Moreover, the FJDA authorizes certain juveniles to be transferred to adult status where they may be tried for conspiracy crimes in adult court.[17] *E.g., United States v. Doe*, 49 F.3d 859 (2d Cir.1995); *United States v. I.D.P.*, 102 F.3d 507 (11th Cir.1996); *United States v. Parker*, 956 F.2d 169 (8th Cir.1992); *United States v. Hemmer*, 729 F.2d 10 (1st Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984). Appellants' argument that they were not capable of "joining" the R Street Crew conspiracy prior to reaching age eighteen, therefore, must fail.

---

17. If the Attorney General certifies to a district court that there is a "substantial Federal interest in the case or the offense" and certain enumerated circumstances exist, the district court must conduct a hearing and make findings of fact in six areas that are considered indicative of the juvenile's rehabilitative potential before determining whether transfer to adult court is in the interest of justice. 18 U.S.C. § 5032. In certain circumstances the transfer may be mandatory rather than discretionary. *Id.*

■ While we disagree in the main with appellants as to the application of U.S.S.G. § 1B1.3 Note 2 to their situation, we do conclude that in the case of a defendant younger than twenty-one at the time of the indictment who joined a conspiracy prior to reaching eighteen, the government must either obtain a transfer of the defendant to adult status or prove that the defendant personally engaged in some affirmative act in furtherance of the conspiracy after turning eighteen before the court may attribute to him as relevant conduct drugs sold by co-conspirators before he reached age eighteen. Although Andre and Donnell Williams were prosecuted for violations of federal conspiracy law committed before as well as after reaching age eighteen, neither one was accorded any of the procedural protections guaranteed by the FJDA. The fact that Andre had reached his twenty-second birthday by the time that he was indicted for offenses arising out of his membership in the R Street Crew placed him outside of the Act's protection. 18 U.S.C. § 5031; *United States v. Hoo*, 825 F.2d 667 (2d Cir.1987), *cert. denied*, 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988). Donnell, on the other hand, was only nineteen at the time of his indictment and fell squarely within the terms of the FJDA's definition of a juvenile.

Under prior circuit precedent, the fact that Donnell continued to participate in the R Street Crew after reaching age eighteen permitted his prosecution as an adult for membership in the conspiracy *See Strothers*, 77 F.3d at 1392. Every court that has considered the issue has required posteighteen participation in the conspiracy because only such conduct signals the adult individual's ratification of prior involvement in the conspiracy as a juvenile. *E.g., United States v. Tolliver*, 61 F.3d 1189 (5th Cir.1995); *United States v. Wong*, 40 F.3d 1347, 1365 (2d Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995); *Maddox*, 944 F.2d at 1233; *United States v. Doerr*, 886 F.2d 944, 969 (7th Cir.1989); *United States v. Cruz*, 805 F.2d 1464, 1476 (11th Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204 (1987). This requirement of continued active participation in order to ratify earlier conspiratorial conduct is a depar-

ture from ordinary conspiracy law, which generally requires affirmative withdrawal from a conspiracy in order to end the period of liability rather than continued affirmative acts in furtherance of the conspiracy. In the case of a conspiracy straddling the defendant's age of majority, however, courts have recognized that a defendant must do something affirmatively to further the conspiracy as an adult in order for his offense to fall outside the FJDA's definition of "juvenile delinquency." Thus, it is clear that the FJDA would not have permitted the government to prosecute a nineteen-year-old Donnell Williams as an adult for substantive offenses completed before he turned eighteen, or for a conspiracy which he abandoned before age eighteen, without first obtaining a FJDA requested transfer from the juvenile court to adult court.

The circuits have not ruled uniformly, however, about whether a defendant like Donnell Williams, who continues to participate in the conspiracy after age eighteen may be held liable as an adult for the illegal acts he committed during the juvenile period of his participation in the conspiracy without an FJDA transfer proceeding. This issue, in turn, has a strong bearing on the question before us as to whether such a defendant can be held liable for the conduct of co-conspirators at the time he was a juvenile. For, if a post-eighteen defendant who ratifies in any way his earlier participation in a conspiracy may be held liable as an adult for those earlier juvenile acts, then there can be little question but that under conspiracy doctrine he can be held liable for co-conspirators' acts during the juvenile period as well. *Cf. Cruz*, 805 F.2d at 1476. But, if he can only be held liable as an adult for membership in the conspiracy on the basis of acts committed after he reached age eighteen, then the question becomes more difficult, *i.e.*, may the juvenile acts be admitted to show the extent of his agreement when he "joined" the conspiracy and the foreseeability to him of co-conspirators' acts? Because our circuit has not previously resolved the question of adult liability for juvenile conduct in conspiracy, we review the reasoning of sister circuits on adult conspiracy prosecutions involving ille-

gal acts committed before the undertwenty-one defendant was eighteen years old.

The Fourth Circuit first confronted the issue in an autotheft conspiracy case in which Rusty Spoone, Jr., the son of the scheme's ringleader, was convicted of a single conspiracy count. *Spoone,* 741 F.2d 680.[18] The government offered evidence of Rusty's pre-eighteen participation in the scheme and of Rusty's continued participation in the conspiracy past his eighteenth birthday, including FBI agents' testimony that on the day Rusty turned eighteen they observed him altering a vehicle identification number on an automobile. The court explained that because a conspiracy continues until its goals are reached, the FJDA does not prevent an adult criminal defendant from being tried as a conspirator simply because he first became embroiled in the conspiracy while still a minor. In holding that the jury was entitled to hear evidence of Rusty's pre-eighteen conduct for the limited purpose of showing knowledge of the conspiracy's existence, the court relied on Federal Rule of Evidence 404(b), which permits the introduction of evidence of *prior conduct* to prove intent or other elements of the *mens rea,* but forbids such evidence to be used to infer the charged wrongful act. The *Chambers* court assured itself that the evidence of pre-eighteen acts was relied on only for permissible purposes under Rule 404(b) because the district court had repeatedly instructed the jury that it could not consider the juvenile acts as evidence of Rusty's guilt and the fact that there was sufficient evidence of post-eighteen conduct to sustain the conspiracy conviction. *Id.* at 687. The Fourth Circuit's decision is clearly consistent with an interpretation of the FJDA that prohibits conviction of an over eighteen but under twenty-one defendant for conspiracy based on the acts he committed while still a minor.

The Eleventh Circuit, in *United States v. Cruz,* 805 F.2d at 1476, agreed that the FJDA does not prevent the district court from asserting jurisdiction over the prosecution of a defendant who was seventeen when he joined the drug distribution scheme so long as there is evidence from which a jury can infer post-eighteen participation in a conspiracy but held that once the case is found to be properly in adult court, the FJDA is no longer relevant and the Federal Rules of Evidence provide the only limit on what the prosecutor can introduce to prove guilt, including juvenile acts. *Id.* at 1476. The Eleventh Circuit relied on the "common sense" notion that "Congress did not intend to bifurcate the prosecution of any continuing offense which began prior to the defendant's reaching the age of eighteen and continued thereafter," *id.* at 1477, and rejected any sort of limiting instruction on the purposes for which the jury could regard the juvenile acts. The government need provide only *prima facie* evidence to persuade the court that there was post-eighteen activity related to the conspiracy to be allowed to conduct the trial as an ordinary adult proceeding. Thus, the split was created and the circuits lined up on two sides.

▮▮▮ The Sixth Circuit followed *Spoone*'s reasoning and explicitly held that the government must prove post-majority acts in furtherance of the conspiracy in order to convict a person whose involvement in the conspiracy commenced prior to her eighteenth birthday. The court stated that "a defendant cannot be held liable for pre-eighteen conduct, but such conduct can, of course, be relevant to put post-eighteen actions in proper context." *Maddox,* 944 F.2d at 1233. The Second and Seventh Circuits followed *Cruz. Wong,* 40 F.3d at 1368 ("the defendant's age at the time the ... offense is completed is the relevant age for the purposes of the [F]JDA and ... an adult defendant may properly be held liable under RICO for predicate offenses committed as a juvenile"); *Doerr,* 886 F.2d at 969 ("once it is established that certain acts of the charged offense occurred after the defendant's eighteenth birthday, it is appropriate for the entire case to be tried in adult court, in accordance with adult rules of procedure and

---

18. Rusty originally was charged with three substantive offenses alleged to have been committed prior to his eighteenth birthday. After realizing that the FJDA would preclude an adult trial, the government dropped the charges with respect to the substantive offenses and pursued only the conspiracy offense, which alleged post-majority participation.

evidence"). The Fifth Circuit along with our own have so far not made the cut. *Strothers,* 77 F.3d 1389; *Tolliver,* 61 F.3d 1189. The question boils down to what the government must prove in order to sustain an adult conviction of an eighteen to twenty-one year old for a conspiracy that commenced when the defendant was a juvenile but continued into his post-eighteen years. For reasons described below, we find that if such a conviction was based solely on adult participation in the conspiracy, and not in whole or in part on acts committed as a juvenile, then the district court would have adult jurisdiction over the offense without the necessity of an FJDA transfer hearing and the Sentencing Guidelines would determine the attribution to the defendant of his co-conspirators' drug dealing. Our reasoning follows.

The FJDA requires certification by the Attorney General as well as a hearing and specific findings of fact by a district judge before a juvenile may be transferred into adult court. Thus, juvenile non-criminal treatment is the rule for wrongful acts including conspiracy committed prior to age eighteen and adult criminal treatment the exception which must be governed by the particular factors of each juvenile's individual case. *Cf. Harling v. United States,* 295 F.2d 161, 164–65 (D.C.Cir.1961). The Supreme Court has recognized that the decision to place a juvenile in adult court is a "critically important' action determining vitally important statutory rights of the juvenile." *Kent v. United States,* 383 U.S. 541, 556, 86 S.Ct. 1045, 1055, 16 L.Ed.2d 84 (1966). Moreover, under the FJDA, if a juvenile is transferred to adult court, but is not convicted of the crime upon which the transfer was based or another crime that would have warranted transfer had the juvenile initially been charged with that crime, any further proceedings concerning the juvenile must be conducted under the terms of the FJDA. This safety valve provision returns a transferred juvenile to his former status if he is found not to have committed an offense that would justify the transfer, indicating Congress' clear intent to limit adult jurisdiction over persons younger than twenty-one only to cases involving specific offenses.

■ The FJDA nowhere specifically addresses the treatment to be accorded a juvenile whose involvement in a conspiracy spans his or her eighteenth birthday. The only rationale that any court has offered for ignoring the FJDA totally when a defendant continues to participate in a conspiracy after turning eighteen years old is the *Cruz* court's "common sense" notion that "Congress did not intend to bifurcate the prosecution of any continuing offense which began prior to the defendant's reaching the age of eighteen and continued thereafter." *Cruz,* 805 F.2d at 1477. The result of that reasoning, however, is that, even though some post-eighteen involvement in the conspiracy must be alleged to justify the adult jurisdiction in the first place, an adult conspiracy conviction need not be based upon those adult acts and evidence of conspiratorial acts committed under eighteen can be relied on for guilt. We, like the Fourth and Sixth Circuits, reject this reasoning as contradictory to the statutory procedures Congress established to try juveniles in adult court for pre-majority acts. Because in our view, and we infer in that of allied courts as well, it is the adult participation that gives the district court jurisdiction over the eighteen to twenty-one year old defendant, evidence of continued membership in the conspiracy must be predicated on the adult acts and the jury ordinarily must be so instructed.

■ In the case of Donnell Williams, the jury was not given a limiting instruction and evidence of his juvenile conduct was admitted at trial as evidence of guilt. We have previously held in *Strothers,* 77 F.3d at 1392, that evidence of premajority acts in a prosecution for an age-of-majority spanning conspiracy is admissible in order to help the jury assess postmajority acts. We believe that includes evidence of juvenile involvement in the conspiracy as probative of knowledge of the conspiracy, when the defendant joined it, the scope of the conspiracy he agreed to and the foreseeability of the acts of co-conspirators. The absence in Donnell's case of an instruction limiting the use of juvenile acts evidence to these permissible purposes, which we believe fall within Federal Rule of Evidence 404(b), did not result in prejudicial error

because there was overwhelming evidence of post-eighteen action in furtherance of the conspiracy; two undercover officers testified that they purchased drugs from Donnell Williams in 1990, after he had reached his eighteenth birthday. (32–115–17, 33–63–68). The error resulting from the failure to give a limiting instruction is harmless because the jury verdict on other points effectively embraces the component that was missing from the jury instructions, *see Rose v. Clark,* 478 U.S. 570, 580–81, 106 S.Ct. 3101, 3107–08, 92 L.Ed.2d 460 (1986); *Carella v. California,* 491 U.S. 263, 271, 109 S.Ct. 2419, 2423–24, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring), and demonstrates beyond a reasonable doubt that the jury found the requisite facts necessary to support the conviction. Here Donnell Williams was convicted separately of two substantive offenses committed in furtherance of the narcotics and RICO conspiracies after he turned eighteen. These verdicts are more than sufficient to meet the adult "actus reus" requirement and demonstrate that Donnell Williams' adult behavior reaffirmed any earlier agreement to participate in the R Street Crew conspiracy. The substantive convictions, therefore, are functionally equivalent to finding that Donnell Williams committed an act in furtherance of the conspiracy after reaching age eighteen and allow no reasonable doubt that the jury found the facts necessary to justify adult jurisdiction and convictions of conspiracy.

■ Once it is determined that Donnell Williams was properly prosecuted and convicted in adult court of narcotics and RICO conspiracy, we reach the final question of how the Sentencing Guidelines are applied to a conviction for a conspiracy that straddled the defendant's eighteenth birthday. Our decision today rests on the premise that adult involvement in such a conspiracy permits the district court to assert adult jurisdiction over the offense without there being an FJDA transfer hearing. The adult conduct ratifies the juvenile agreement to join the conspiracy and the juvenile participation in the conspiracy. *See Maddox,* 944 F.2d at 1233. The Sentencing Guidelines apply to the adult conviction according to their plain terms. The court may consider as relevant conduct all acts of the defendant and all

reasonably foreseeable acts or omissions of others in furtherance of the jointly undertaken activity, "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Since Donnell Williams was properly convicted in adult court of a conspiracy he joined as a juvenile but continued in after eighteen, the Guidelines unambiguously permit the court to consider his and his co-conspirators' foreseeable conduct "that occurred during the commission of the [entire conspiracy] offense," *id.,* starting when he joined the conspiracy at age eleven.

### 4. *Withdrawal From Conspiracy*

Appellant Andre Williams contends that the absence of any evidence at trial that he sold, packaged, processed, or distributed drugs or that he otherwise participated in the R Street Crew conspiracy after October 22, 1990, when he commenced employment at the Government Printing Office demonstrate that he had withdrawn from the conspiracy and should not be held accountable for drugs handled by the conspiracy after that date. He points to no evidence, however, that demonstrates an affirmative effort to withdraw from the conspiracy by communicating that intent to his co-conspirators.

■ A conspiracy is an "ongoing offense that lasts, absent one's affirmative withdrawal from the enterprise, as long as *any* coconspirator continues to further common ends...." *Childress,* 58 F.3d at 733. If a conspiracy's ends have not been fully accomplished, the relationship of the conspirators to it remains the same as it was at the moment the conspiracy was brought to life. *Hyde v. United States,* 225 U.S. 347, 368, 32 S.Ct. 793, 802–03, 56 L.Ed. 1114 (1912). Whatever overt acts are committed along the way are steps toward the conspiracy's ends, but do not completely accomplish those ends. Thus conspirators remain members of conspiracies until they "mak[e] a clean breast to the authorities or communicat[e] the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v.*

*Walls,* 70 F.3d 1323, 1327 (D.C.Cir.1995) (citations omitted). Appellant has the burden of proving that he affirmatively withdrew from the conspiracy if he wishes to benefit from his claimed lack of involvement after October 22, 1990. *United States v. Dale,* 991 F.2d 819, 854 (D.C.Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). Appellant has not met that burden here. Accordingly, there was no error in the district court's attribution to Andre Williams as relevant conduct the drugs handled by the conspiracy after October 22, 1990.

5. *Downward Departure for Youthful Lack of Guidance*

 A sentence must be within the applicable Guideline range unless the court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). Departures from the presumptively applicable Guideline range are discretionary. *United States v. Sammoury,* 74 F.3d 1341, 1343 (D.C.Cir.1996). "Hence, if the judge correctly understood the Sentencing Guidelines and the evidence, knew he could depart, and yet decided to stick to the guideline range, there has been no incorrect application of the Guidelines ... and so the resulting sentence cannot be set aside." *Id.* A sentencing decision is reviewable, however, if the sentencing court mistakenly believes that it lacks authority to depart or if the sentencing court rested its decision not to depart on a clearly erroneous factual finding. *Id.* at 1343–44.

 Appellant requested a downward departure based on youthful lack of guidance. The mitigating circumstance of lack of youthful guidance may exist when "a past condition ... may have led a convicted defendant to criminality." *United States v. Floyd,* 945 F.2d 1096, 1101 (9th Cir.1991); *United States v. Clark,* 8 F.3d 839, 845 (D.C.Cir.1993).[19] Appellant argued that all his early role mod-

els, including his three older brothers—two of whom are convicted leaders of the R Street Crew—members of his extended family, and his step-father were actually involved in dealing drugs. Vast amounts of guns and drugs were stored and processed in the home. As proof of his unhealthy environment, appellant pointed out at his sentencing that he missed over 100 days of school in 11th grade alone, had a GPA of .333, and never graduated high school. The district court recognized that Andre Williams "was the youngest of these brothers who engaged in, in fact, the whole family, as defense counsel is asserting, engaged in, except for the [younger] sister, in narcotics dealing for many years, and he was raised apparently in a family where at the males of which and some of the females were engaged in drugs since he was a young child and that he became involved in that situation as a matter of course." 4/21/94 Tr. at 35. Nonetheless, the court denied the request, explaining

[h]e was raised in a household with a mother and stepfather present. Even though there were concerns of drug dealing with him, there's no indication that he was abused or neglected as a child. He did eventually obtain employment. There's no indication he couldn't have left and gone away from this as he became an adult, and therefore I don't see any basis for any departure under the Ninth Circuit cases cited by the defendant. *United States v. Floyd,* 945 F.2d 1096, a 1991 Ninth Circuit case, because of the defendant's youthful lack of guidance had a significant effect on both his past criminality and on his commission of the instant offense, according to that court.

.... I am cognizant of the fact he missed a majority of time in his tenth [sic] grade. He did very poorly in school, but that relates to his being out drug dealing, and I don't think that follows that he had a youthful lack of guidance, where he's had some stable family members in his home,

**19.** The Guidelines were amended in 1992 to prohibit departures based on youthful lack of guidance. U.S.S.G. § 5H1.12. Because the instant offense occurred prior to the amendment to the Guidelines, and retroactive application of the

amendment would violate the *Ex Post Facto* Clause, *United States v. Johns,* 5 F.3d 1267 (9th Cir.1993), it remained a legally permissible basis for departure at the time of Mr. Williams' sentencing.

and I think as he got more mature and became a little older, he had plenty of time therefore to strike out on his own, but chose not to.

4/21/94 Tr. at 44–45.

■ Appellant argues that the court's factual findings were clearly erroneous because the court found that his drug-dominated environment was stable. Although we recognize the significant—arguably overwhelming—negative influences in appellant's childhood environment, we cannot find the district court's findings clearly erroneous. The court recognized that it had the authority to grant a departure for youthful lack of guidance, acknowledged the involvement of virtually every member of appellant's family in drug activity, yet decided not to depart from the ordinary Guideline range. While another decision would have been entirely legitimate, the district court has virtually unreviewable discretion not to depart and, accordingly, we do not disturb its decision here.

### E. *Donnell Williams*

For sentencing purposes, the district court assigned appellant Donnell Williams [20] a base offense level of 42 by attributing to him all of the drugs handled during the conspiracy.[21] *See* U.S.S.G. § 2D1.1(a)(3)(c)(1). The court added a two-level enhancement for possession of a firearm. *See id.* § 2D1.1(b)(1). Agreeing with Williams' objection to the suggestion in the presentence report that he receive a supervisory role enhancement, *see id.* § 3B1.1(b), the district court applied a total offense level of 44, which is treated as 43 under the Guidelines pursuant to U.S.S.G. Ch. 5, Pt. A. With a criminal history category of I, the sentencing range under the

Guidelines for Williams' conspiracy convictions was life imprisonment. The district court sentenced Williams to life imprisonment on both conspiracy counts, to 240 months imprisonment for drug distribution, and to 48 months imprisonment for the use of a communications facility in connection with drug transactions, all sentences to run concurrently. Williams challenges the drug quantities attributed to him as a result of his relevant conduct in the conspiracy and the weapons enhancement; neither challenge has merit.[22]

■ Williams contends that the district court failed to make individualized findings at sentencing regarding the scope of his conspiratorial agreement and the reasonable foreseeability of the drug quantities to him. Because Williams fails to demonstrate that any failure by the district court to enter sufficiently particularized findings at sentencing could be harmful, the alleged failure cannot result in a remand. *See Childress,* 58 F.3d at 724. The evidence of Williams' involvement in the R Street Crew was overwhelming. He was a runner throughout the conspiracy, engaged with the leaders of the organization both as to his pay and the organization's retaliatory activities against rival drug operations, and personally and repeatedly participated in the organization's acts of violence. For example, Dax Nelson testified that Williams, along with Sparrow and Maurice Brooks, sold drugs at Lincoln and R for Darryl Williams in 1987 and 1988. Chris Smith testified that Williams sold drugs on R Street in 1987, worked for Darryl Williams, Jeffrey Williams, and Andre Williams, and went on several occasions to

---

20. References hereinafter to "Williams" are to Donnell Williams, unless otherwise stated.

21. Williams was convicted of RICO conspiracy (Count 2), narcotics conspiracy (Count 3), distribution of five or more grams of cocaine base (Count 93), and use of a communication facility in connection with that offense (Count 94). The district court granted Williams' motion for judgment of acquittal on the count of substantive RICO (Count 1).

22. Williams' contention that the sentence of life without parole violates the Eighth Amendment,

because there is no evidence that he could have reasonably foreseen the distribution of drugs equivalent to 300,000 kilograms of marijuana, is meritless. The district court rejected Williams' Fifth and Sixth Amendment claims, noting that Williams had had an opportunity to enter a plea and chose not to, and was not being assessed special punishment because he chose to go to trial. We find no basis to disturb the district court's conclusion. To the extent Williams challenges his sentence as violative of due process, it is meritless. *See infra* pp. 272–273. His Eighth Amendment challenge, if viewed separately, is unsubstantiated and vague.

the "shop" [23] to mix PCP. Sparrow testified that in late 1988 and early 1989, Williams was one of several runners selling drugs under his supervision, and sometimes went with Sparrow to turn in money to Darryl Williams; Sparrow paid Williams $400–500 per week. Moreover, Sparrow recounted that once he paid Williams less than he thought he deserved and Williams complained to Jeffrey Williams, who gave him additional money.

Several other witnesses testified regarding Williams' high level of involvement with the R Street Crew. Witherspoon testified that when he began selling for the R Street Crew in 1987, Williams was already selling for the organization at Lincoln and R. Frankie Pelham, who began working for the R Street Crew in 1988, testified that Williams and several others sold at Lincoln and R Streets every day, and that they all worked for Darryl Williams and Jeffrey Williams, reporting to several intermediate lieutenants. Rosalind Cherry testified that Williams worked for Odenga Dyson and McKinley Board, and that in the summer of 1989, she saw Williams and the other runners selling drugs on R Street. Maurice Brooks testified that Williams was still selling drugs on R Street in early spring 1989, and continued to sell drugs for Darryl Williams and Jeffrey Williams throughout the summer of 1989. Brooks also testified that when someone "shot up" R Street, he and Williams and other runners met with McKinley Board, and when Board discovered money missing from his room, he and Dyson threatened the runners with guns and forced them to return the money.

Brooks also testified about a staged robbery he and Williams committed for Darryl Williams. Stephoun Hartwell testified that he sold drugs with Williams on R Street under the supervision of Board and Dyson. Williams also was implicated in several of the R Street Crew's acts of violence. Finally, on two occasions in 1990, undercover officers bought drugs from Williams.[24] Given the overwhelming evidence of Williams' drug activities throughout the duration of the conspiracy, his *Childress* claim fails.

■ Williams' challenge to his weapons enhancement similarly fails. The evidence demonstrated that on repeated occasions Williams carried a gun in relation to his role in the R Street Crew's activities, and that Williams was present on several occasions when members of the R Street Crew sought violent retaliation against rival gangs. The district court determined that the two-level increase for use of weapons applied based on the evidence that Williams had participated in the armed robbery of two purchasers from the conspiracy and a taperecorded conversation in which Williams said that he had obtained a .38 caliber pistol. Due to the overwhelming evidence of Williams' role in the organization's acts of violence, the district court did not err in enhancing his sentence.

### F. *Gregory Thomas*

As with the other appellants, Judge Hogan attributed the total amount of drugs to Thomas, which yielded a base offense level of 43. *See* U.S.S.G. §§ 2D1.1(a)(3)(c)(1), 2D1.2 (1992). Judge Hogan then imposed a three-level increase for Thomas' managerial role in the conspiracy, U.S.S.G. § 3B1.1(b); a two-level increase for possessing a firearm on the basis of Thomas' 1987 Superior Court conviction for possession of a pistol, U.S.S.G. § 2D1.1(b)(1); and a two-level increase because Thomas allegedly had threatened a family member of a government informant, U.S.S.G. § 3C1.1 (obstruction of justice). These increases yielded an adjusted offense level of 50, which under the Sentencing Guidelines is treated as a total offense level of 43.

---

**23.** The "shop" refers to one of the R Street Crew's stash houses, belonging to Andre Williams' uncle and aunt. The government presented evidence that beginning in 1987, and continuing for one or two years, the R Street Crew packaged PCP and marijuana in the basement of the shop three times a week.

**24.** An undercover officer for the Metropolitan Police Department purchased crack cocaine from Donnell Williams on March 15, 1990. Another officer testified that he arrested Williams and Hartwell on February 21, 1990, following a lookout broadcast by an undercover officer who had observed them engage in a drug transaction.

Thomas raises six challenges to his sentence: (1) the *Ex Post Facto* Clause and rule of lenity prohibit application of the Sentencing Guidelines to him because his involvement with the conspiracy began before the adoption of the Sentencing Guidelines; (2) the disparity between his actual sentence and the sentences received by government informants constitutes a punishment for his exercise of his right to trial; (3) Judge Hogan improperly attributed the total amount of drugs involved in the conspiracy to him; (4) there was no credible evidence supporting the three-level enhancement for his role as a manager in the conspiracy; (5) there was no evidence that his sentence should have been enhanced for weapons possession; and (6) there was no credible evidence that Thomas had threatened a relative of a government informant. We reject each of these arguments.

1. *Application of Sentencing Guidelines to Pre–Enactment Conduct*

■ Thomas (joined by Donnell Williams) argues that the Sentencing Guidelines cannot be applied to his conspiracy convictions without running afoul of the *Ex Post Facto* Clause. In *United States v. Dale*, 991 F.2d at 853, however, we held that the Sentencing Guidelines apply to conspiracies that begin before the effective date of the Sentencing Guidelines and continue after the effective date. *See also United States v. Dean*, 55 F.3d 640, 666 (D.C.Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996); *United States v. Wilson*, 26 F.3d 142, 161 (D.C.Cir.1994), *cert. denied*, 514 U.S. 1051, 115 S.Ct. 1430, 131 L.Ed.2d 311 (1995). Evidence established, and Thomas does not contest, that he participated in the conspiracy after 1987, so the Guidelines were properly applied to Thomas.

■ Thomas also argues that the rule of lenity requires that sentencing be based only on *post-enactment* conspiratorial conduct—particularly where Thomas' involvement in the conspiracy was already effected by November 1, 1987. Thomas' argument is that the provision of the Sentencing Act of 1987, Pub.L. No. 100–182, § 2(a), 101 Stat. 1266 (1987), codified at 18 U.S.C. § 3551 note (1994), which provided that the Sentencing Guidelines "shall apply only to offenses committed after" November 1, 1987, is ambiguous as to the applicability of the guidelines to offenses begun before and continuing after November 1, 1987. In support of this position, Thomas cites *United States v. Story*, in which the court found the statutory language ambiguous, but ultimately held that the Guidelines apply to straddling conspiracies. 891 F.2d 988, 992 (2d Cir.1989).

■ As the government argues, however, the rule of lenity is only applicable where there is an ambiguity that cannot be resolved through other methods of statutory interpretation. The Supreme Court has stated that:

> The rule of lenity, however, is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seize[d] every thing from which aid can be derived, it is still left with an ambiguous statute. The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.

*Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991) (internal quotations and citations omitted). The legislative history of the Sentencing Act of 1987—which *Story* and other courts have read as indicating Congress' intent that the Sentencing Guidelines apply to straddling conspiracies, *see* 891 F.2d at 991–95—and the numerous opinions that have applied the Guidelines to "straddling" conspiracies, *see infra* p. 272, weigh against applying the rule of lenity.

Thomas argues, again citing *Story*, that the rule of lenity should apply because the Sentencing Guidelines impose harsher penalties on defendants in drug cases than did the prior sentencing regime. Thomas relies on the following passage from *Story*:

> [T]he interpretation issue we face does not arise in a context in which a new sentencing arrangement always yields higher sentences than the prior system. Were that the case, the rule of lenity might support

an interpretation favoring broad application of pre-Guidelines law.

891 F.2d at 994. Thomas argues that "nearly a decade of draconian punishments meted forth under the Sentencing Guidelines" renders the premise of this statement absent here. Assuming *arguendo* that if the Sentencing Guidelines always imposed harsher penalties, the rule of lenity would necessarily apply, there is no way to tell whether the Guidelines produce more severe punishment except on a case-by-case basis; in many cases higher ranges in sentences result not from the Guidelines but from new mandatory minimums.

We believe, as the government argues, that since the Sentencing Guidelines apply to "straddling" conspiracies, sentencing should be based on all of the conspiratorial conduct, not just the conduct that occurred post-enactment. As one of our sister circuits put it: "Since the guidelines affirmatively direct the sentencing court to include relevant conduct in furtherance of the conspiracy offense when calculating the guidelines ranges, and since there is absolutely no indication that Congress intended to prohibit the court's reliance on such conduct simply because it occurred prior to the guidelines' effective date, we find no merit to appellant's argument that the court improperly relied on drug deliveries which occurred prior to November 1, 1987." *United States v. Terzado–Madruga,* 897 F.2d 1099, 1124 (11th Cir.1990); *see also United States v. David,* 940 F.2d 722, 740–41 (1st Cir.) (same), *cert. denied,* 502 U.S. 989, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991); *United States v. Cusack,* 901 F.2d 29, 32 (4th Cir. 1990) (same); *United States v. Allen,* 886 F.2d 143, 145–46 (8th Cir.1989) (same); *Cf. United States v. Roederer,* 11 F.3d 973, 976 (10th Cir.1993) (district court properly included as relevant conduct quantity of drugs involved in drug conspiracy that terminated prior to effective date of Sentencing Guidelines in determining sentence for post-enactment crime).

2. *Sentencing Guidelines as a Sanction on Exercise of Right to Go to Trial*

 Thomas (again joined by Donnell Williams) argues that he was unconstitution-

ally punished for going to trial. Thomas rejected a government offer of a plea to the general conspiracy statute, 18 U.S.C. § 371, and a sentence of five years—an offer which required cooperation and testimony from Thomas—and proceeded to trial, after which he was sentenced to life. Thomas does not contend that the district court's sentencing determination was meant to penalize him for the exercise of his right to go to trial, nor does he offer any evidence that the prosecutor's initial charging decision was designed to penalize him. Instead, his argument is simply that the difference between the plea bargain sentence of five years (which was received by others who cooperated with the government) and his actual sentence of life imprisonment impermissibly infringed on his "right to go to trial."

As the government points out, Thomas' argument is quite similar to the argument made in *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). In *Bordenkircher,* the defendant was indicted for an offense punishable by a term of two to ten years in prison. The prosecutor offered to recommend a sentence of five years in prison if the defendant would plead guilty; if the defendant did not, the prosecutor would seek to indict the defendant as a habitual criminal, subjecting the defendant to a mandatory life sentence. *Id.* at 358–59, 98 S.Ct. at 665–66. Noting that the "case would be no different if the grand jury had indicted [the defendant] as a recidivist from the outset, and the prosecutor had offered to drop that charge as part of the plea bargain," *id.* at 361, 98 S.Ct. at 666, the Court held that "the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment," *id.* at 365, 98 S.Ct. at 669. So long as the defendant is "free to accept or reject the prosecution's offer," *id.* at 363, 98 S.Ct. at 668, the choice is simply the inevitable consequence of plea bargaining, which the Court accepted as a legitimate process. *Id.* at 363–65, 98 S.Ct. at 667–69.

Thomas claims that *Bordenkircher* is inapplicable because the Supreme Court was never confronted with a "robotic sentencing system" which "virtually guarantee[s]" that the decision to proceed to trial will result in a much greater sentence. But Thomas simply does not explain how his situation differed from the defendant's in *Bordenkircher*: Thomas was fully aware that he was exposing himself to the possibility of a huge sentence; he points to no evidence that the prosecutor was motivated by a desire to punish him for exercising his right to go to trial; and he knowingly declined a five-year sentence.

### 3. Drug Attribution, and Managerial and Weapons Enhancements

■ Thomas argues that the district court erred in attributing the total amount of drugs to him, in imposing a three-level enhancement for his role as a manager, and in enhancing his sentence for weapons possession.[25] As to Thomas' involvement in the conspiracy, Judge Hogan found that:

> There's *no question* to the Court's mind that the evidence supports a finding that Mr. Thomas, as a coconspirator, is responsible for the acts of the other coconspirators and for the quantity of drugs overall that were distributed as a result of this conspiracy.
>
> He was not a runner . . . or a mule who delivered some drugs one time. The evidence supports the findings as it goes to his objections about being enhanced as a lieutenant. The evidence supports that he did supervise street sellers, the runners; that he was close to some of the R Street Crew's leaders; that he was engaged in violent activities of various kinds and as a result of which he was evidently attempted to be murdered by other individuals allegedly involved within the Bailey organization [a rival gang]; that there's *no question* in the Court's mind the evidence supports a finding that he was a lieutenant in the organization. He was trusted with delivery of guns or had proceeds of

drugs as well as handled and actively oversaw drug runners on the streets, according to the convictions in this case as well as the other evidence in the case.

> Additionally, his assessment for two levels for possession of a handgun, he was convicted of carrying a handgun on August 13, 1987, in the R Street area at the time that there was testimony there was an ongoing situation with the Edmunds group in an attempt to control territory.
>
> It seems to the Court additionally that that is a fair assessment of two levels, because the dangerous weapon was possessed and obviously it occurred during the time of this conspiracy and was in the same area and was testified to as, according to the government's witness, as being related to the drug organizational work.

Thomas does not offer any reasons for rejecting these findings as clearly erroneous; instead, he simply asserts that there was no evidence supporting them. But this is not the case: the evidence established that Thomas was a runner selling daily for the organization as early as 1985; that Thomas was a partner of the gang's leaders; that he paid and supervised runners; that he stabbed a rival dealer over gang turf; that he helped organize retaliatory strikes against members of other gangs; that he sold a gun to a member of the organization; and that he was convicted of gun possession in 1987. The evidence clearly supports the attribution of the total amount of drugs to Thomas, the enhancement for his role as manager, and the enhancement for weapons possession.

### 4. Obstruction of Justice Enhancement

Thomas also contends that there was no credible evidence supporting his obstruction of justice enhancement. At Thomas' sentencing, Judge Hogan accepted the finding of the Probation Office that Thomas had threatened a family member of a possible government informant. But the pretrial testimony and pleadings relied upon by the Probation Office were simply proffers by the govern-

---

**25.** Thomas principally contends that these sentencing determinations were erroneous because they considered conduct occurring before the enactment of the Sentencing Guidelines; as this argument fails, *see supra* pp. 270–272, we construe these challenges to his sentence as applying to pre- *and* post-enactment conduct.

ment that Thomas had made this threat; the government never introduced independent evidence of the threat. Although Thomas never introduced evidence rebutting these proffers, he did contest the evidence supporting them, and we do not believe the proffers, without more, support the enhancement. But even without the enhancement, Thomas' adjusted offense level would have been 48, which is treated as a total offense level of 43, the same total offense level for which he was sentenced. We thus need not remand for resentencing.

Accordingly, we affirm the judgments of conviction.